# UNITED STATES *v.* CALIFORNIA

No. 5, Orig.   Argued February 27, 1978—Decided May 15, 1978

STEWART, J., delivered the opinion of the Court, in .which BRENNAN, POWELL, REHNQUIST, and STEVENS, JJ., joined.   WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and BLACKMUN, J., joined, *post,* p. 42.   MARSHALL, J., took no part in the consideration or decision of the case.

*Allan A. Ryan, Jr.* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Bruce C. Rashkow,* and *Michael W. Reed.*

*Russell Iungerich,* Deputy Attorney General of California, argued the cause for defendant.   With him on the briefs were *Evelle J. Younger,* Attorney General, and *N. Gregory Taylor,* Assistant Attorney General.

Mr. Justice Stewart delivered the opinion of the Court.

The question in this case, arising under our original jurisdiction, is whether California or the United States has dominion over the submerged lands and waters within the Channel Islands National Monument, which is situated within the three-mile marginal sea off the southern California mainland.[1] For the reasons that follow, we hold that dominion lies with California and not the United States.

The Antiquities Act of 1906 authorizes the President to reserve lands "owned or controlled by the Government of the United States" for use as national monuments.[2] Pursuant to this Act, President Franklin Roosevelt in 1938 issued Presidential Proclamation No. 2281, 52 Stat. 1541. This Proclamation "reserved from all forms of appropriation under the public-land laws" most of Anacapa and Santa Barbara Is-

---

[1] This case is part of ongoing litigation stemming from an action brought in this Court more than three decades ago. *United States* v. *California,* 332 U. S. 19. The first decree was entered in 1947, 332 U. S. 804; a supplemental decree was entered in 1966, 382 U. S. 448; and a second supplemental decree in 1977, 432 U. S. 40. In each instance, jurisdiction was reserved to enter further orders necessary to effectuate the decrees. California initiated the present suit under the 1966 reservation of jurisdiction:

"As to any portion of such boundary line or of any areas claimed to have been reserved under § 5 of the Submerged Lands Act as to which the parties may be unable to agree, either party may apply to the Court at any time for entry of a further supplemental decree." 382 U. S., at 453.

[2] Section 2 of the Act, 34 Stat. 225, 16 U. S. C. § 431 (1976 ed.), provides in pertinent part as follows:

"The President of the United States is authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."

lands, which were then federal lands,[3] and set them aside as the Channel Islands National Monument.[4]   As the Proclamation recognized, these islands "contain fossils of Pleistocene elephants and ancient trees, and furnish noteworthy examples of ancient volcanism, deposition, and active sea erosion . . . ." *Ibid.*

The two large islands and the many smaller islets and rocks surrounding them also shelter a variety of marine life, some rare or endangered.   Prompted by a desire to protect these species [5] and other "objects of geological and scientific interest," President Truman issued a Proclamation in 1949, enlarging the Monument to encompass "the areas within one nautical mile of the shoreline of Anacapa and Santa Barbara Islands . . . ."   Presidential Proclamation No. 2825, 63 Stat. 1258.   It is undisputed that the islets and protruding rocks

---

[3] Federal title to the islands can be traced to the 1848 Treaty of Guadalupe Hidalgo, 9 Stat. 922, by which Mexico ceded to the United States the islands lying off the coast of California, along with the adjacent mainland. See Bowman, The Question of Sovereignty over California's Off-Shore Islands, 31 Pac. Hist. Rev. 291 (1962).   While the Treaty obligated the United States to respect private property rights derived from Mexican land grants, all nongranted lands previously held by the Government of Mexico passed into the federal public domain.   When California was admitted to the Union in 1850, the United States retained ownership of these public lands.   See An Act for the Admission of the State of California into the Union, 9 Stat. 452.

[4] The 1938 Proclamation did not reserve as a national monument the entire land area of these two islands.   Portions were exempted for continued lighthouse purposes, for which the entire islands had previously been reserved.   52 Stat. 1541.

[5] As early as 1940, Government officials recognized that enlargement of the Monument would be desirable to protect the birds, sea otters, elephant seals, and fur seals that inhabit the rocks and islets encircling the two large islands, and early drafts of the 1949 Proclamation acknowledged an intent to protect marine life.   But after a representative of the Department of Justice expressed the view that the Antiquities Act did not permit establishment or enlargement of a national monument to protect plant and animal life, all references to marine life were dropped from the Proclamation.

within these one-mile belts have long belonged to the United States and, as a result of President Truman's Proclamation, are now part of the Monument.[6]  It is equally clear that the tidelands of Anacapa and Santa Barbara Islands, as well as of the islets and rocks, belong to California.[7]  What is disputed in this litigation is dominion over the submerged lands and waters within the one-mile belts surrounding Anacapa and Santa Barbara Islands.[8]

When President Truman issued Proclamation No. 2825 in 1949, the submerged lands and waters within these belts were under federal dominion and control, as a result of this Court's decision two years earlier in *United States* v. *California,* 332

---

[6] As noted previously, the Antiquities Act authorizes the President to set aside only "lands owned or controlled by the Government of the United States . . . ." 34 Stat. 225, 16 U. S. C. § 431 (1976 ed.).  Like Anacapa and Santa Barbara Islands, the islets and rocks protruding above the water within the boundaries of the extended Monument were in 1949 public lands owned by the Federal Government.  See n. 3, *supra.*

[7] The term "tidelands" is "defined as the shore of the mainland and of islands, between the line of mean high water and the line of mean lower low water . . . ." *United States* v. *California,* 382 U. S., at 452.  Those tidelands in California that had not been subject to Mexican land grants entered the federal public domain in 1848, where they remained in trust until California gained statehood in 1850.  At that time, they passed to the State under the "equal footing" doctrine.  See *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10; *United States* v. *California,* 382 U. S. 448.  Because the tidelands within the Monument were not "owned or controlled" by the United States in 1938 or in 1949, Presidents Roosevelt and Truman could not have reserved them by simply issuing proclamations pursuant to the Antiquities Act.

[8] The present controversy apparently arose when California was frustrated in carrying out its program of leases for the harvesting of kelp in these waters.  Giant kelp known as *Macrocystis* grows in the water along portions of the California coast and is harvested to obtain various substances, including algin, a chemical with many commercial uses.  See North, Giant Kelp, Sequoias of the Sea, National Geographic (Aug. 1972), and Zahl, Algae: the Life-givers, National Geographic (Mar. 1974).

U. S. 19. That case had held that the United States was "possessed of paramount rights in, and full dominion and power over, the lands, minerals and other things underlying the Pacific Ocean lying seaward of the ordinary low-water mark on the coast of California, and outside of the inland waters, extending seaward three nautical miles . . . ." *United States* v. *California,* 332 U. S. 804, 805.

There can be no serious question, therefore, that the President in 1949 had power under the Antiquities Act to reserve the submerged lands and waters within the one-mile belts as a national monument, since they were then "controlled by the Government of the United States." [9] Thus, whether Proclamation No. 2825 did in fact reserve these submerged lands and waters, or only the islets and protruding rocks, could be, at the time of the Proclamation, a question only of Presidential intent, not of Presidential power.

In addressing the controversy now before us, the parties have devoted large parts of their briefs to canvassing this question of intent: What did the Proclamation mean by the use of the word "areas"? [10] We find it unnecessary, however,

[9] Although the Antiquities Act refers to "lands," this Court has recognized that it also authorizes the reservation of waters located on or over federal lands. See *Cappaert* v. *United States,* 426 U. S. 128, 138–142; *United States* v. *Oregon,* 295 U. S. 1, 14.

[10] In preparation for the Proclamation, memoranda were circulated within and among Government agencies, many of which proposed adding to the Monument "all islets, rocks, and waters" within one nautical mile of Anacapa and Santa Barbara Islands. The final version of the 1949 Proclamation, however, was not so clear. It began: "WHEREAS it appears that certain *islets and rocks* situated near Anacapa and Santa Barbara Islands . . . are required for the proper care, management, and protection of the objects of geological and scientific interest located on lands within [the Channel Islands National Monument] . . . ." (emphasis added). The Proclamation then went on to reserve "the areas within one nautical mile" of each of the two large islands, "as indicated on the diagram hereto attached . . . ." The diagram showed Anacapa and Santa Barbara Islands,

to decide this question. For even assuming that President Truman intended to reserve the submerged lands and waters within the one-mile belts for Monument purposes, we have concluded that the Submerged Lands Act, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.*, subsequently transferred dominion over them to California.

The very purpose of the Submerged Lands Act was to undo the effect of this Court's 1947 decision in *United States* v. *California*, 332 U. S. 19. In enacting it, Congress "recognized, confirmed, established, and vested in and assigned to," § 6 (a), 67 Stat. 32, 43 U. S. C. § 1314 (a), the States "(1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources . . . ." § 3 (a), 67 Stat. 30, 43 U. S. C. § 1311 (a). The submerged lands and waters within one mile of Anacapa and Santa Barbara Islands plainly fall within this general grant.[11]

each encircled by a broken line at a distance of one mile from the island's shoreline. At the bottom of the two maps appeared acreage figures that, according to stipulations filed by the parties, described approximately the entire surface area circumscribed by the broken lines.

[11] Section 2 (a) (2) of the Act, 67 Stat. 29, 43 U. S. C. § 1301 (a) (2), defines "lands beneath navigable waters" as "all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles . . . ." The term "natural resources" is defined in § 2 (e), 43 U. S. C. § 1301 (e), to "includ[e], without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life" but not "water power, or the use of water for the production of power . . . ."

The United States contends, however, that the Submerged Lands Act did not operate to relinquish these submerged lands and waters to California because of an exception to the broad statutory grant that Congress provided in § 5 (a) of the Act.[12] The final clause of § 5 (a), upon which the United States relies, exempted from the grant "any rights the United States has in lands presently and actually occupied by the United States under claim of right." [13] The legislative history shows that this "claim of right" clause was added to preserve unperfected claims of federal title from extinction under § 3's general "conveyance or quitclaim or assignment." [14] In the words of the Acting Chairman of the Senate Committee on Interior and

---

[12] Section 5 (a) of the Act, 67 Stat. 32, 43 U. S. C. § 1313 (a), provides: "There is excepted from the operation of section 3 of this Act—

"(a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right."

[13] The parties have stipulated that "the United States 'presently and actually occupied' the areas within one nautical mile of the shoreline of Anacapa and Santa Barbara Islands for purposes of Section 5 of the Submerged Lands Act of 1953, 43 U. S. C. § 1313." Thus, the question is simply what "rights" the United States had in these submerged lands and waters in 1953.

[14] Remarks of Senator Cordon, Hearings on S. J. Res. 13 et al. before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 1322 (1953). During Committee hearings on the bill, the following exchange

Insular Affairs, the clause "neither validates the claim nor prejudices it," but merely "leaves it where we found it" for eventual adjudication.[15]

The entire purpose of the Submerged Lands Act would have been nullified, however, if the "claim of right" exemption saved claims of the United States based solely upon this Court's 1947 decision in *United States* v. *California*. Not surprisingly, therefore, the legislative history unmistakably shows that the "claim of right" must be "other than the claim arising by virtue of the decision in [that case] . . . ."[16] Thus, this exception applies to the submerged lands and waters in controversy here only if the United States' claim to them ultimately rests on some basis other than the "paramount rights" doctrine of this Court's 1947 *California* decision.

The United States has pointed to no other basis for believing that the submerged lands and waters in question were owned

---

occurred between Senator Kuchel and Senator Cordon, who was Acting Chairman of the Committee:

"Senator KUCHEL. What does 'claim of right' mean?

"Senator CORDON. Well, it means that the United States is in actual occupancy and claims it has a right to the occupancy.

"Senator KUCHEL. And it permits the United States to keep the property in the absence of a title?

"Senator CORDON. No; it does not. It leaves the question of whether it is a good claim or not a good claim exactly where it was before. This is simply an exception by the United States of a voluntary release of its claim, whatever it is. It does not, in anywise, validate the claim or prejudice it.

"Senator KUCHEL. Why should we recognize it, Senator, any more than any other so-called color or title of claim . . . ?

"Senator CORDON. For the reason that in my opinion, Senator, this land now is not land to which the State has title and we are conveying title. We may except what we will." *Id.*, at 1321.

[15] *Id.*, at 1321, 1322.

[16] *Id.*, at 1322.

or controlled by the United States in 1949. The crucial question, then, is whether the 1949 reservation of the submerged lands and waters for Monument purposes (assuming that was the intent of the Proclamation) somehow changed the nature of the Government's claim. If it did not—if the ownership or control of these areas by the United States in 1953 existed solely by virtue of this Court's 1947 decision in *United States v. California*—then § 3 (a) of the Submerged Lands Act transferred "title to and ownership of" the submerged lands and waters to California, along with "the right and power to manage, administer, lease, develop, and use" them. 67 Stat. 30, 43 U. S. C. § 1311 (a).

We have concluded that the 1949 Proclamation did not and could not enhance the strength of the Government's basic claim to a property interest in the submerged lands and waters in controversy. Reservation of federally controlled public lands for national monument purposes has the effect of placing the area reserved under the "supervision, management, and control" of the Director of the National Park Service. 39 Stat. 535, 16 U. S. C. §§ 1–3 (1976 ed.). Without such reservation, the federal lands would remain subject to "private appropriation and disposal under the public land laws," 78 Stat. 985, 43 U. S. C. § 1400 (c), or to continued federal management for other designated purposes, see, *e. g., ibid.;* 78 Stat. 986, 43 U. S. C. § 1411. The Antiquities Act of 1906 permits the President, "in his discretion," to create a national monument and reserve land for its use simply by issuing a proclamation with respect to land "owned or controlled by the Government of the United States." 34 Stat. 225, 16 U. S. C. § 431 (1976 ed.). A reservation under the Antiquities Act thus means no more than that the land is shifted from one federal use, and perhaps from one federal managing agency, to another.[17]

---

[17] This view is reflected in a memorandum written by the Director of the Bureau of Land Management to the Director of the National Park Service

A reservation for a national monument purpose cannot operate to escalate the underlying claim of the United States to the land in question.

Congress was well aware of its power to transfer to the States as much or as little of the submerged lands in which the Government held "paramount rights" as it deemed wise. With that knowledge, Congress expressly "emphasize[d] that the exceptions spelled out in [§ 5] do not in anywise include any claim resting solely upon the doctrine of 'paramount rights' enunciated by the Supreme Court with respect to the Federal Government's status in the areas beyond inland waters and mean low tide." S. Rep. No. 133, 83d Cong., 1st Sess., pt. 1, p. 20 (1953). A plainer statement of congressional intent would be hard to find.

Because the United States' claim to the submerged lands and waters within one mile of Anacapa and Santa Barbara Islands derives solely from the doctrine of "paramount rights" announced in this Court's 1947 *California* decision, we hold that, by operation of the Submerged Lands Act, the Government's proprietary and administrative interests in these areas passed to the State of California in 1953.[18]

---

in 1947, in response to the latter's proposal that the Channel Islands National Monument be enlarged:

"If you wish to have these islands added to the Channel Islands National Monument, the bureau will be glad to prepare an appropriate proclamation. In the event you desire at this time to have the islands withdrawn for national monument classification, a public land order to accomplish this purpose will be prepared."

[18] With the exception, of course, of any interests retained by the United States via provisions other than the last clause of § 5 (a) of the Submerged Lands Act. For example, § 6 (a) provides for the retention by the United States of its navigational servitude and its "rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs . . . ." 67 Stat. 32, 43 U. S. C. § 1314 (a).

The parties are requested to submit an appropriate decree within 90 days.

*So ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of the case.

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACKMUN join, dissenting.

Although the majority lucidly states the issue in this case, it plainly errs in deciding it.

Section 5 (a) of the Submerged Lands Act excepted from its general cession of land to the States those "rights the United States has in lands presently and actually occupied by the United States under claim of right." [1] Actual title to the lands was not required; lands to which the United States held title were already excepted by the previous language in § 5 (a). The reference to claims of right was critical for the United States' stake in submerged lands, since *United States* v. *California,* 332 U. S. 19 (1947), and 332 U. S. 804 (1947), did not actually vest the United States with title to the submerged lands. While specifically denying California title, the Court fell short of declaring title in the United States, recognizing instead the federal "paramount rights" in the lands. *Id.,* at 805.

Section 5 (a) was added at the suggestion of the Attorney General. His purpose was to guarantee "that all installations and acquisitions of the Federal Government within such area [as was to be ceded] belong to it." [2] Senator Holland's original Joint Resolution No. 13 had provided:

"There is excepted from the operation of section 3 of this Act—

"(a) all specifically described tracts or parcels of land

---

[1] 43 U. S. C. § 1313 (a).

[2] Letter of Attorney General Brownell, Hearings on S. J. Res. 13 et al. before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 935 (1953) (hereafter Hearings).

and resources therein or improvements thereon title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the decisions of the courts of such State, or their respective grantees, or successors in interest, by cession, grant, quitclaim, or condemnation or from any other owner or owners thereof by conveyance or by condemnation, provided such owner or owners had lawfully acquired the title to such lands and resources in accordance with the statutes or decisions of the courts of the State in which the lands are located . . . ." Hearings 14.

The Attorney General's substitute read as follows:

"There is excepted from the operation of section 3 of this Joint Resolution:

"(a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by the United States when the State entered the Union; all lands acquired by the United States by eminent domain proceedings; all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and all lands presently occupied by the United States under claim of right . . . ." *Id.,* at 935.

The clearest, most observable difference between the original draft and the language proposed by the Attorney General is this final statement about "lands presently occupied by the United States under claim of right." [3] The conclusion is that

---

[3] There is no quarrel that the use of the word "lands" in this context extends to submerged lands. The Act concerns submerged lands in its sec-

44

some lands to which the United States did not possess outright title might be part of federal installations, and, if so, they were to be preserved in federal control. This inference is strongly supported in further legislative history.

The Acting Chairman of the Senate Committee on Interior and Insular Affairs explained to the Joint Resolution's author why the Committee had added the phrase concerning claim of right:

"I should like to add that the last language quoted, namely, 'any rights the United States has in lands presently and actually occupied by the United States under claim of right,' came into the bill at the request of the Department of Justice. It was presented to the committee and explained by the Department of Justice as being for the purpose of reserving to the Federal Government the area of any installation, or part of an installation—and I use the term 'installation' to distinguish a specific area, used for a specific purpose, from any vast area that might be claimed under the paramount right doctrine—actually occupied by the Government under a claim of right." 99 Cong. Rec. 2619 (1953) (Sen. Cordon).

The resolution's author, Senator Holland, asked the Acting Chairman:

"Am I correct in understanding that under that particular provision the mere fact that the Supreme Court might have held that the United States has paramount rights in submerged lands beyond mean low water, and within State boundaries, would not in any way give the United States the right to claim exceptions of such lands from the joint resolution, *in view of the fact that such*

---

tion ceding the area to the States, 43 U. S. C. § 1311, and similarly in this section concerning exceptions to that cession.

*lands would not be 'presently and actually occupied by the United States'?* Am I correct in that understanding? "Mr. CORDON: The Senator is correct in his understanding." *Ibid.* (emphasis added).

Hence, the test is whether the lands held under some claim of right are "actually occupied" by the Federal Government. If so, they are not relinquished.

The same issue arose in the hearings, with identical resolution. The Acting Chairman explained:

"[A]ny land occupied by the United States under claim by the United States that it has a right there, is excluded from this conveyance or quitclaim or assignment. . . . It is general language that . . . protects every installation of every kind." Hearings 1322.

Senator Long summarized, to the Acting Chairman's agreement:

"That, in effect, says that this act does not at all affect any land which the United States is actually occupying. And that means that a representative of the United States Government in one capacity or another is occupying that land." *Ibid.*

Senator Long was concerned that the definition of occupied lands might be stretched to include submerged lands over which the Federal Government had been given dominion in *United States* v. *California,* 332 U. S. 19 (1947), by reason of the fact that the United States Navy from time to time might sail across them. It was in response to *that* suggestion that the Acting Chairman made the statement quoted by the majority that " 'the claim of right' [is] 'other than the claim arising by virtue of the decision in [that case] . . . .' " [4] Such a construction was, of course, barred, for it would eviscerate the purpose of returning any sub-

---

[4] *Ante,* at 39, quoting Hearings 1322.

merged lands. *Ante,* at 39. But this ignores the much narrower meaning of "submerged lands occupied by the United States under claim of right" which was intended: the submerged lands that were actually occupied as part of a federal "installation," meaning "a specific area, used for a specific purpose." The distinction is between a general claim under *United States* v. *California* to paramount rights, and a very specific claim associated with a federal installation actually occupied. Recalling the Acting Chairman's words: "Occupancy to me is some type of actual either continuous possession or possession in such way as to indicate that the individual claims some special right there different from a vast unoccupied area." [5] "[The language is] for the purpose of reserving to the Federal Government the area of any installation, or part of an installation—and I use the term 'installation' to distinguish a specific area, used for a specific purpose, from any vast area that might be claimed under the paramount right doctrine . . . ." [6]

The Channel Islands National Monument includes the submerged lands within a one-mile radius of Anacapa and Santa Barbara Islands. [7] The parties have stipulated that "the United States 'presently and actually occupied' the areas within one nautical mile of the shoreline of Anacapa and Santa

---

[5] *Ibid.*

[6] 99 Cong. Rec. 2619 (1953).

[7] Although the point is contested, there is little left to decide upon reading in President Truman's Presidential Proclamation No. 2825 of February 9, 1949, 63 Stat. 1258, that "the areas within one nautical mile of the shoreline of Anacapa and Santa Barbara Islands" were added to the National Monument. The parties have stipulated that "the acreage figures shown on the diagram accompanying Presidential Proclamation No. 2825 are figures which approximate the total surface area of Anacapa and Santa Barbara Islands and one nautical mile of waters surrounding those islands." App. 2. This leaves no force at all to defendant's reliance on the Proclamation's preamble which refers to "certain islets and rocks" but not specifically to submerged lands or water.

Barbara Islands for purposes of Section 5 of the Submerged Lands Act of 1953, 43 U. S. C. § 1313." [8]  The federal occupation is to fulfill the specific purpose of providing for "the proper care, management, and protection of the objects of geological and scientific interest located on lands within the said monument." Presidential Proclamation No. 2825, 63 Stat. 1258. The federal occupation is under claim of right, since only federally "owned or controlled" property can be made into a national monument. 16 U. S. C. § 431 (1976 ed.).

The majority opinion stresses that the United States' occupation of the submerged lands within the Channel Islands National Monument [9] was originally premised on federal control of those areas as granted in *United States* v. *California, supra.* This is true. The paramount rights of the United States to these submerged lands, and the absence of California title to them, were recognized in that 1947 decision. In 1949, President Truman allocated a small portion of all the submerged lands within the Federal Government's paramount rights to become part of the Channel Islands National Monument. And in 1953, all the submerged lands not actually occupied by the Federal Government were ceded to the States. But the Channel Islands National Monument remained.

Submerged lands for which the federal claim rested "solely upon the doctrine of 'paramount rights' " [10] were given up by the Federal Government. The majority's quotation of that statement comes from that part of the Senate Report explaining why the Attorney General's language was accepted, the language that included for the first time "rights . . . in

---

[8] *Id.,* at 1. The stipulation was made contingent upon a finding that the submerged lands and waters within the one-mile radius were found to be part of the National Monument.

[9] The majority does not reach whether the submerged lands are actually within the Monument.

[10] S. Rep. No. 133, 83d Cong.; 1st Sess., pt. 1, p. 20 (1953).

lands presently and actually occupied by the United States under claim of right . . . ." It says "any claim resting *solely* upon the doctrine of 'paramount rights' " (emphasis added) is lost to the Federal Government, but the majority holds that any claim *originating* in the doctrine of paramount rights is lost. The majority does not recognize that some rights can originate in the paramount-rights doctrine, yet rest on actual occupation under claim of right as part of a federal installation, annexed before the doctrine of paramount rights was waived in 1953.

That, I respectfully submit, is an erroneous interpretation of even that one bit of legislative history.[11] It is also contrary to the dominant theme in the legislative history that general, amorphous paramount rights claims were lost, but specific claims coupled with actual occupation of an installation were not. And most critically, the majority view is without support in the statute's plain language that "all lands presently occupied by the United States under claim of right" were preserved. It is stipulated that the lands were occupied, and a *claim* of right certainly arises when a President treats property in a manner to which only United States property is subject.[12]

I respectfully dissent.

---

[11] The purpose of the Attorney General's proposed amendment was to preserve federal control over "all installations and acquisitions of the Federal Government within such area." Hearings 935. The submerged lands within a one-nautical-mile radius became an "acquisition" of the Channel Islands National Monument "installation" in 1949.

[12] On the face of the statute, it might be asked how any claim of right could arise more clearly than for a President to incorporate the property within a national monument. If President Truman did not act under claim of right, it is hard to surmise how he did act.