*113 Justice Scalia,
with whom The Chief Justice and Justice Thomas join,
concurring in part and dissenting in part.
I join all of the Court’s opinion, except for Part V and the related portions of Part VI. I do not agree with the conclusion that the United States expressly retained title to submerged lands within Glacier Bay National Monument (Monument) at the time of Alaskan statehood.
The Court holds that the United States has rebutted the “strong presumption” that submerged lands passed to Alaska when it became a State. Ante, at 100,110. That presumption inheres in the equal-footing doctrine, but is given particular strength and specificity in this case by §6(m) of the Alaska Statehood Act, 72 Stat. 343, which incorporated the Submerged Lands Act of 1953, including the confirmation that a State owns all “lands beneath navigable waters within [its] boundaries” unless (as relevant here) they were “expressly retained by or ceded to the United States when the State entered the Union,” 43 U. S. C. §§ 1311(a), 1313(a) (emphasis added). The Court acknowledges that state title to submerged lands cannot be defeated “ ‘ “unless the intention was definitely declared or otherwise made very plain.”’” Ante, at 100 (quoting United States v. Alaska, 521 U. S. 1, 34 (1997) (Alaska (Arctic Coast)), in turn quoting United States v. Holt State Bank, 270 U. S. 49, 55 (1926)). Though the Court makes a dictal feint toward the Antiquities Act of 1906, ante, at 103, its holding relies on only a single proviso to §6(e) of the Alaska Statehood Act, ante, at 104-110.
That proviso seems to me anything but a “ Very plain’ ” or “clear” retention of the Monument’s submerged lands. Alaska (Arctic Coast), supra, at 34, 57. Indeed, the Court’s own evaluation of the parties’ textual arguments is candidly lukewarm toward the United States’ position. Alaska’s doomed construction of the proviso is deemed to be “neither necessary nor preferred,” ante, at 107 — not exactly a death knell when Alaska’s opponent is subject to the dear-statement requirement. The Court applauds the United *114 States’ construction — the victorious, allegedly “clear” one— just for being “not. . . illogical,” and admits that that construction means the statute was not written in “the usual style.” Ibid.
The statutory text fully justifies this lack of exuberance. Section 5 of the Alaska Statehood Act established a general rule that “the United States shall retain title to all property ... to which it has title . . . .” 72 Stat. 340. Section 6(m), by incorporating the Submerged Lands Act, generally excepted submerged lands from that rule. Id., at 343. Another exception to the rule of U. S. retention was §6(e), which consisted of two relevant parts: the main clause, which required the “transfe[r] and conveyance] to the State of Alaska” of “[a]ll real and personal property of the United States ... specifically used for the sole purpose of conservation and protection of the fisheries and wildlife of Alaska, under [certain statutory provisions],” id., at 340; and the proviso, which said “[t]hat such transfer shall not include lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife,” id., at 341. The short of the matter is that if the proviso created only an exception from the preceding main clause, it did not reserve Glacier Bay (which was not covered by the main clause) for the United States; whereas if it was an independent and freestanding reservation, it did.
The Court unconvincingly attempts to sever the proviso from its statutory text and context. It is true enough that by accumulation of sloppy usage a proviso need not, simply by reason of its introductory words (“provided that”), always be taken as a limitation only upon the preceding clause. Ante, at 106. But the Court fatally fails to cope with the actual text of this particular proviso. It claims, ante, at 107, that §6(e) moves from a specific main clause (“[a]ll real and personal property” under three statutes) to a general proviso (“lands withdrawn ... as refuges”). But “lands” is not inherently more general than “real... property” and there is *115 no reason whatever why the qualified former (“lands withdrawn ... as refuges”) cannot be a subset of the qualified latter (“real... property” under three statutes). Moreover, the Court disregards obvious clues to the relationship between these two parts of §6(e). It makes no attempt to identify the antecedent for the proviso’s reference to “such transfer.” (Emphasis added.) As it happens, the main clause of §6(e) contains the only mention of a “transfe[r]” in the Statehood Act that precedes the proviso,[1] making it the only logical antecedent. Thus, the word “such” indicates the natural, structural tie between §6(e)’s main clause and its proviso, making it quite clear that the proviso does not reserve to the United States all “lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife,” but rather only the lands of that description covered by the preceding main clause. Moreover, the proviso is phrased as a carveout (“such transfer shall not include lands”) rather than a freestanding rule (e. g., “no transfer shall include lands” or “lands shall not be transferred”). In sum, the text amply supports Alaska’s claim that the proviso operates as an exception to the main clause, and not the Court’s conclusion that it is “an independent and general rule uncoupled from [that] clause,” ante, at 110.
The Court also contends that its 1997 decision in Alaska (Arctic Coast) “foreclose^]” Alaska’s argument that the proviso operates as an exception to the main clause of §6(e). Ante, at 107. That conclusion follows from neither the holding of Alaska (Arctic Coast) nor any reasonable extension of its underlying rationale. As the Court acknowledges, ante, at 109, “Alaska (Arctic Coast) did not directly address the relationship between the initial clause and the proviso in § 6(e).” It quoted them as if they were a single, unitary rule, 521 U. S., at 55, and, as the United States concedes, the Court *116 “assum[ed] with no briefing,” Tr. of Oral Arg. 34, that the refuge at issue fell within the scope of the main clause of §6(e). Given that assumption, the case does not stand for the proposition that the proviso is a freestanding provision; a proviso limited to the main clause would have the same effect. Or to put the point differently: Alaska (Arctic Coast) holds that what the proviso takes out of § 6(e) it also takes out of § 6(m). In the present case, however, it is undisputed that Glacier Bay is not within §6(e), and so is not removed from §6(e) by the proviso. Nothing in Alaska (Arctic Coast) suggests that the proviso alone operated “affirmatively and independently,” ante, at 108, to trump § 6(m). The Court is thus knocking down a straw man when it says that, if the proviso can trump §6(m), it would make “little sense” to cabin it with the main clause of § 6(e), ibid. It was not the proviso that trumped §6(m), but the proviso’s removal of land from the exception of § 6(e). There is no such removal here.
The only part of the Court’s opinion on Glacier Bay that displays genuine enthusiasm is its Ursine Rhapsody, which implies that federal ownership of submerged lands is critical to ensuring that brown bears will not be shot from the decks of pleasure yachts during their “distressing[ly] frequen[t]” swims to islands where they feast on seabirds and seabird eggs.[2] Ante, at 99. Surely this is irrelevant to interpretation of the Alaska Statehood Act, unless there is some principle of construction that texts say what the Supreme Court thinks they ought to have said. But besides being irrelevant, it is not even true. Many (though perhaps not all) means of fulfilling the Monument’s purposes could be achieved without federal ownership of the submerged lands within the Monument. If title to submerged lands passed to Alaska, the Federal Government would still retain *117 significant authority to regulate activities in the waters of Glacier Bay by virtue of its dominant navigational servitude, other aspects of the Commerce Clause, and even the treaty power.[3] See, e. g., 43 U. S. C. § 1314(a) (under the Submerged Lands Act, the United States retains “powers of regulation and control of . . . navigable waters for the constitutional purposes of commerce [and] navigation”); United States v. Morrison, 529 U. S. 598, 609 (2000) (Congress may “regulate the use of the channels of interstate commerce” and “protect the instrumentalities of interstate commerce, or persons or things in interstate commerce” (internal quotation marks omitted)); United States v. Alaska, 503 U. S. 569, 577-583 (1992) (the Secretary of the Army may consider effects upon recreation, fish and wildlife, natural resources, and other public interests when refusing to permit structures or discharges in navigable waters that have “no effect on navigation”); United States v. California, 436 U. S. 32, 41, and n. 18 (1978) (noting that the United States retained “its navigational servitude” even when California took the “proprietary and administrative interests” in submerged lands surrounding islands in a national monument); Douglas v. Seacoast Products, Inc., 431 U. S. 265, 284-287 (1977) (finding *118 state regulation of commercial fishing partially pre-empted by federal statute); Letter from W. C. Henderson, Acting Chief, Bureau of Biological Survey, Dept, of Agriculture, to Stephen T. Mather, Director, National Park Service (Nov. 4, 1926), Alaska Exh. AK-405 (noting that a colony of eider ducks in and near the Monument was “protected at all times by the Migratory Bird Treaty Act and Regulations thereunder”). It is thus unsurprising that States own submerged lands in other federal water parks, such as the California Coastal National Monument and the Boundary Waters Canoe Area in Minnesota. See California, supra, at 37; Brief for National Parks Conservation Association as Amicus Curiae 30.
I would probably find for Alaska on the Glacier Bay issue even if the United States did not have to overcome the obstacle of “very plain” retention. With the addition of that well-established requirement, the ease is not even close. Because neither text, nor context, nor precedent compels the conclusion that the Alaska Statehood Act expressly retained the Monument’s submerged lands for the United States, I cannot agree with the Court’s conclusion that the United States deserves summary judgment on count IV of Alaska’s amended complaint.

 The only other mention of a “transfe[r]” in § 6 appeared in subsection (k), which “confirmed and transferred” all grants previously made to the Territory of Alaska. 72 Stat. 343.

 It is presumptively true that the seabirds consider these visits distressingly frequent, and demonstrably true that the brown bears do not. It is unclear why this Court should take sides in the controversy.

 The United States presented evidence that, even before the Monument was established, some scientists had studied the bottom of Glacier Bay and its relationship with the glaciers by taking soundings of the water’s depth. Memorandum in Support of Motion of the United States for Partial Summary Judgment on Count IV of the Amended Complaint 13. Similar but more sophisticated studies, involving acoustic mapping and sonar imaging of gouges in the floor of the bay, are conducted today. App. 5 to Declaration of Tomie Patrick Lee, Exhibits to Reply of United States in Support of Motion for Partial Summary Judgment on Count IV of Amended Complaint, Tab No. 8, pp. 93-94 (Exh. U. S. IV-8). Alaska’s ownership of submerged lands should not hinder such studies, generally conducted from vessels on the water’s surface. But the United States also noted that other, newer means of scientific study — such as withdrawing core samples from submerged lands and installing listening devices on the surface of submerged lands — would require Alaska’s cooperation. Tr. of Oral Arg. 40.