# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 22, 2019       Decided December 27, 2019

No. 18-5353

MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, ET AL.,
APPELLANTS

v.

WILBUR ROSS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
DEPARTMENT OF COMMERCE, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00406)

———

*Jonathan Wood* argued the cause for appellants. With him on the briefs were *Damien M. Schiff* and *Joshua P. Thompson*.

*Avi Kupfer*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *Andrew C. Mergen* and *Robert J. Lundman*, Attorneys.

*Katherine Desormeau* argued the cause for defendants-intervenors-appellees. With her on the brief were *Ian Fein*, *Peter Shelley*, and *Roger Fleming*.

*David J. Berger* and *Justin A. Cohen* were on the brief for *amici curiae* Academic Scientists in support of appellees.

*Paul M. Thompson* was on the brief for *amici curiae* Alison Rieser, et al. supporting defendant's brief affirming the District Court.

*Nicholas A. DiMascio*, *Samantha R. Caravello*, and *Lori Potter* were on the brief for *amicus curiae* National Audubon Society in support of appellees and supporting affirmance.

*Andrew J. Pincus* was on the brief for *amici curiae* Senator Richard Blumenthal and Senator Brian Schatz in support of appellees and for affirmance of the District Court's judgment.

*Douglas W. Baruch* was on the brief for *amici curiae* Ocean and Coastal Law Professors in support of defendants-appellees and defendants-intervenors-appellees and affirmation.

Before: TATEL and MILLETT, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Acting pursuant to the Antiquities Act, 54 U.S.C. §§ 320301 et seq., President Obama established the Northeast Canyons and Seamounts Marine National Monument to protect "distinct geological features" and "unique ecological resources" in the northern Atlantic Ocean. Proclamation No. 9496, 3 C.F.R. 262, 262 (2017) ("Monument

Proclamation"). Several commercial-fishing associations challenged the creation of the Monument, arguing that the President exceeded his statutory authority. The district court disagreed and dismissed the complaint. With a minor alteration, we affirm.

**I.**

"[A] statute of historical importance for natural resource conservation and for archeological and historic preservation in the United States," the Antiquities Act grew out of a movement to protect the nation's unique historical, archeological, and scientific heritage. Bruce Babbitt, *Introduction*, in *The Story of the Antiquities Act* (Ronald F. Lee, 2001). "[B]eg[inning] in 1879," "[a] whole generation of dedicated . . . scholars, citizens, and members of Congress . . . through [their] explorations, publications, exhibits, and other activities," *id.* (internal quotation marks omitted), pushed for the enactment of "national preservation legislation," culminating in 1906 with the passage of the Antiquities Act, Ronald F. Lee, *The Antiquities Act, 1900–06*, in *The Story of the Antiquities Act* (Ronald F. Lee, 2001). To this day, the Act remains "a major part of the legal foundation for archeological, historic, and natural conservation and preservation in the United States." Babbitt, *supra*.

The Act provides that "[t]he President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a). The Act also authorizes the "President [to] reserve parcels of land as a part of the national monuments," so long as reservations are "confined to

the smallest area compatible with the proper care and management of the objects to be protected." *Id*. § 320301(b).

Over the last century, Presidents have created a total of 158 national monuments, protecting a wide range of the nation's historic and scientific resources. National Park Service, *List of National Monuments*, https://www.nps.gov/archeology/sites/ antiquities/monumentslist.htm. For example, President Theodore Roosevelt established the Grand Canyon National Monument, reserving some 800,000 acres of land in the Arizona desert to protect "the greatest eroded canyon within the United States." Proclamation No. 794, 35 Stat. 2175, 2175 (Jan. 11, 1908). More recently, President Clinton established the Hanford Reach National Monument in Washington to protect "the largest remnant of the shrub-steppe ecosystem that once blanketed the Columbia River Basin." Proclamation No. 7319, 3 C.F.R. 102, 102 (2001). And President George W. Bush created the Northwestern Hawaiian Islands Marine National Monument—later renamed the Papahānaumokuākea Marine National Monument, Proclamation No. 8112, 3 C.F.R. 16, 16 (2008)—reserving nearly 140,000 square miles of ocean off the Hawaiian coast to protect the area's "dynamic reef ecosystem, . . . home to many species of coral, fish, birds, marine mammals, and other flora and fauna." Proclamation No. 8031, 3 C.F.R. 67, 67 (2007).

Continuing in that tradition, President Obama reserved roughly 5,000 square miles of ocean to create the Northeast Canyons and Seamounts Marine National Monument ("the Monument"). Monument Proclamation, 3 C.F.R. at 262. Lying some 130 miles southeast of Cape Cod, the Monument consists of two non-contiguous units. *Id*.; *see infra* Figure 1. The first covers three underwater canyons that "start at the edge of the geological continental shelf and drop from 200 meters to thousands of meters deep." Monument Proclamation, 3 C.F.R.

at 262. The second covers four extinct undersea volcanoes—called seamounts—that rise "thousands of meters from the ocean floor." *Id*. "Because of the steep slopes of the canyons and seamounts, oceanographic currents that encounter them create . . . upwelling" that "lift[s] nutrients . . . from the deep to sunlit surface waters," fueling "an eruption of [plankton] that form[s] the base of the food chain." *Id*. at 262–63. "Together the geology, currents, and productivity create diverse and vibrant ecosystems" home to assorted marine flora and fauna, including rare species of deep-sea corals. *Id*. at 263. Accordingly, the Monument protects both "the canyons and seamounts themselves" as well as "the natural resources and ecosystems in and around them." *Id*. at 262.

Significantly for the issue before us, the Monument lies entirely in the U.S. Exclusive Economic Zone ("EEZ"), the belt of ocean between 12 and 200 nautical miles off the nation's coasts over which the United States exercises dominion under international law. *See* Restatement (Third) of Foreign Relations Law § 511(d), cmt. b ("Restatement") (explaining that costal states exercise sovereign rights over their exclusive economic zones). President Reagan created the U.S. EEZ in 1983 by issuing a proclamation that claimed for the United States

> sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living, of the seabed and subsoil and the superjacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds; and [] jurisdiction with regard to the establishment and use of artificial islands, and installations and structures

> having economic purposes, and the protection
> and preservation of the marine environment.

Proclamation No. 5030, 3 C.F.R. 22, 23 (1984) ("Reagan Proclamation"). "The United States . . . exercise[s] these sovereign rights and jurisdiction in accordance with the rules of international law." *Id.*

Consistent with that authority and pursuant to several statutes, the federal government regulates a range of activity in the U.S. EEZ. The National Marine Sanctuaries Act, 16 U.S.C. §§ 1431 et seq. ("Sanctuaries Act"), authorizes the federal government to designate and manage marine sanctuaries in the "United States exclusive economic zone." *Id.* § 1437(k). The Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 et seq., empowers the federal government to "exercise[] sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish, within the exclusive economic zone." *Id.* § 1801(b)(1). And the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 et seq., provides a framework for the federal government to exploit the seabed's natural resources within the "outer Continental Shelf," defined to include the U.S. EEZ. *Id.* § 1331(a); *see id.* (defining the "outer Continental Shelf" as "all submerged lands" beyond the lands reserved to the States up to the edge of the United States' "jurisdiction and control"); *see also* Dep't of the Interior, Office of the Solicitor, *Authority to Issue Outer Continental Shelf Mineral Leases in the Gorda Ridge Area*, 92 Interior Dec. 459, 487 (May 30, 1985) (explaining that the statutory definition of "outer Continental Shelf" includes the submerged lands within the EEZ).

In this case, several commercial-fishing associations ("the Fishermen") challenged the Monument's designation, arguing that the President "exceeded his statutory authority" under the

Act because (1) the ocean is not "land" under the Antiquities Act; (2) the Monument is not compatible with the Sanctuaries Act; (3) the U.S. EEZ is not "controlled" by the federal government; and (4) the area reserved is not the "smallest area compatible" with management. *Massachusetts Lobstermen's Association v. Ross*, 349 F. Supp. 3d 48, 51, 58 (D.D.C. 2018). Several conservation groups intervened to defend the Monument. *Id*. at 51.

The district court concluded that the President acted within his statutory authority in creating the Monument and dismissed the Fishermen's claims. *Id*. It first rejected the Fishermen's argument that the Monument "is *per se* invalid because it lies entirely in the ocean," explaining that "Supreme Court precedent, executive practice, and ordinary meaning" establish that the Act reaches submerged land. *Id*. at 55–56. Second, the district court found that the President's interpretation of "the Antiquities Act does not render the Sanctuaries Act redundant" because the two statutes "address environmental conservation . . . in different ways and to different ends." *Id*. at 59. Third, the court found that the federal government "adequately controls the EEZ for purposes of the Act," *id*. at 60, not only because it "exercises substantial general authority over the EEZ" and "possesses specific authority to regulate the EEZ for purposes of environmental conservation," but also because "no private person or sovereign entity rivals the federal government's dominion over the EEZ," *id*. at 64. And finally, the district court addressed the Fishermen's "fact-specific arguments about the boundaries of the Monument," observing that "to obtain judicial review of claims about a monument's size, plaintiffs must offer specific, nonconclusory factual allegations establishing a problem with its boundaries" and that the Fishermen's "allegations here d[id] not rise to that level." *Id*. at 67.

On appeal, the Fishermen press the same claims as they did in the district court: that the Monument is not "land," not compatible with the Sanctuaries Act, not "controlled" by the federal government, and not the "smallest area compatible" with management.

**II.**

Our court set out a framework for reviewing challenges to national monument designations in two companion cases, *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002), and *Tulare County v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002). There, we drew a distinction between two types of claims: those justiciable on the face of the proclamation and those requiring factual development. The former are resolved "as a matter of law" because they turn on questions of statutory interpretation. *Tulare*, 306 F.3d at 1140. As for the latter, although the precise "scope of judicial review" remains an open question, at a minimum, plaintiffs' pleadings must contain plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority. *Mountain States*, 306 F.3d at 1133. The Fishermen's first three claims—that the Monument is not "land," not compatible with the Sanctuaries Act, and not "controlled" by the federal government—can be judged on the face of the proclamation and resolved as a matter of law. Their last claim requires plausible factual allegations that the Monument is not the "smallest area compatible" with management to survive dismissal. We consider each in turn.

**A.**

The Fishermen first contend that the Monument is invalid because it "is not land, as that term is ordinarily understood." Appellants' Br. 22. This argument need not detain us long because, as the district court explained, the Supreme Court has

consistently held that the Antiquities Act reaches submerged lands and the waters associated with them. In *Cappaert v. United States*, 426 U.S. 128 (1976), the Court determined that the Antiquities Act "g[a]ve the President authority to reserve" Devil's Hole—an underground pool of water near Death Valley that housed a rare species of fish—as part of Death Valley National Monument, rejecting the contention that the Act protected "archeologic sites" only. *Id*. at 141–42. The Court emphatically extended the point in *United States v. California*, 436 U.S. 32 (1978): "[t]here can be no serious question that the President . . . had power under the Antiquities Act to reserve the submerged lands and waters" of Channel Islands National Monument. *Id*. at 36. "Although the Antiquities Act refers to 'lands,'" the Court explained, "it also authorizes the reservation of waters located on or over federal lands." *Id*. at 36 n.9. And in *Alaska v. United States*, 545 U.S. 75 (2005), which concerned Glacier Bay National Monument, the Court again made clear that "the Antiquities Act empowers the President to reserve submerged lands." *Id*. at 103.

The Fishermen insist that the Supreme Court's pronouncements in *Cappaert*, *California*, and *Alaska* are non-binding dicta because, they say, the cases concerned only whether Presidents intended to include submerged lands in their proclamations, not whether they had the authority to do so. The Fishermen are mistaken. At least in *Alaska*, the Supreme Court's holding expressly included its determination that the Antiquities Act reaches submerged lands. "[A] necessary part of [its] reasoning," the Court explained, was that "in creating Glacier Bay National Monument the United States had reserved the submerged lands underlying Glacier Bay and the remaining waters within the monument's boundaries." 545 U.S. at 100–01. Had the President lacked authority to reserve the submerged lands in the first place, the Court would have had no reason to inquire into whether he had, in fact, intended

to do so. *Cf. United States v. Windsor*, 570 U.S. 744, 759 (2013) (explaining that legal conclusions that are "necessary predicate[s]" to a court's holding are "not dictum"). In any event, "even if technically dictum," "carefully considered language of the Supreme Court . . . generally must be treated as authoritative." *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) (internal quotation marks omitted).

Although the parties advanced, and the district court considered, other arguments about whether the Act reaches submerged lands—including arguments about historic practice and ordinary meaning—we need not wade into those waters, so to speak. On-point Supreme Court precedent resolves this claim.

**B.**

The Fishermen next argue that interpreting the Antiquities Act to permit ocean-based monuments would render the Sanctuaries Act "a practical nullity." Appellants' Br. 27. Congress enacted the Sanctuaries Act "to identify and designate as national marine sanctuaries areas of the marine environment which are of special national significance and to manage these areas as the National Marine Sanctuary System." 16 U.S.C. § 1431(b)(1). Because past conservation efforts "ha[d] been directed almost exclusively to land areas above the high-water mark," Congress crafted the Sanctuaries Act to "complement[] existing regulatory authorities" by protecting "certain areas of the marine environment possess[ing] conservation, recreational, ecological, historical, scientific, educational, cultural, archeological, or esthetic qualities." *Id*. § 1431(a)(1), (a)(2), (b)(2). To that end, the Sanctuaries Act empowers the Secretary of Commerce to "designate any discrete area of the marine environment as a national marine sanctuary and promulgate regulations implementing the

designation," *id*. § 1433, but only after complying with certain procedural requirements, *id*. §§ 1433–1434.

According to the Fishermen, by setting out a specific process to protect marine environments, the Sanctuaries Act precludes Presidents from using the Antiquities Act to do the same. As the Fishermen see it, a President's use of the Antiquities Act to create marine monuments renders the Sanctuaries Act "entirely redundant" because "[a]ny area that could be designated as a marine sanctuary could be more easily designated as an ocean monument . . . with the latter approach evading all of the substantive and procedural requirements of the former." Appellants' Br. 25, 29.

The Fishermen are again mistaken. Applying the Antiquities Act to oceans does not nullify the Sanctuaries Act for a simple reason: the two statutory schemes differ in several critical respects. Whereas the Antiquities Act limits national monuments to the "smallest area compatible" with monument management, 54 U.S.C. § 320301(b), the Sanctuaries Act permits marine sanctuaries to occupy an area of any size "that will permit comprehensive and coordinated conservation and management," 16 U.S.C. § 1433(a)(5). Whereas the Antiquities Act protects "objects of historic or scientific interest," 54 U.S.C. § 320301(a), the Sanctuaries Act protects areas' "recreational," "cultural," or "human-use values," 16 U.S.C. § 1433(a)(2). And whereas the Antiquities Act focuses on protecting specific "objects" of historic or scientific interest, 54 U.S.C. § 320301(a), the Sanctuaries Act focuses on designating and managing "areas as the National Marine Sanctuary System," 16 U.S.C. § 1431(b)(1). Thus, a marine sanctuary may be larger, protect more diverse values, and serve different overall goals than an ocean-based monument.

Indeed, we rejected a nearly identical argument in *Mountain States*, where the challengers asserted that the President's designation of six national monuments in the western United States "def[ied] congressional intent regarding the scope and purpose of 'a host' of other statutes enacted to protect various archeological and environmental values." 306 F.3d at 1138. We disagreed, explaining that the "contention that the Antiquities Act must be narrowly construed in accord with [the challengers'] view of Congress's original intent [regarding those statutes] misse[d] the mark" because it "misconceive[d] federal laws as not providing overlapping sources of protection" for environmental values. *Id*. The same is true here: that the Antiquities and Sanctuaries Acts "provid[e] overlapping sources of protection" for marine environments neither requires the Antiquities Act to "be narrowly construed" nor "def[ies] congressional intent regarding the scope and purpose of [the Sanctuaries Act]." *Id*.

Contrary to the Fishermen's contentions, then, ocean-based monuments are perfectly compatible with the Sanctuaries Act.

## C.

Next, the Fishermen argue that the Monument is invalid because the federal government does not control the area of ocean where it is located. Recall that the statute gives the President monument-creating authority over "land owned or controlled by the Federal Government." 54 U.S.C. § 320301(a). According to the Fishermen, by pairing "owned" with "controlled," Congress intended the two words to have similar meanings, such that to "control[]" an area the federal government's authority there must be akin to its authority over federally "owned" land. And, the Fishermen continue, the

federal government lacks control, so understood, over the U.S. EEZ.

Once more, the Fishermen misread the statute. Generally, "[c]ontrol and ownership . . . are distinct concepts." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003). Congress made that distinction plain here by separating "controlled" and "owned" with the conjunction "or," signaling that "the words . . . are to be given separate meanings." *United States v. Woods*, 571 U.S. 31, 45 (2013) (internal quotation marks and citations omitted). Nothing about the proximity of "owned" to "controlled" changes that: "[t]hat a word may be known by the company it keeps is . . . not an invariable rule, for the word may have a character of its own not to be submerged by its association." *Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (quoting *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923)). Accordingly, the federal government may "control[]" land even if it lacks authority akin to ownership there. And, here, three factors convince us that the federal government exercises sufficient authority to "control[]" the U.S. EEZ for purposes of the Act.

First, "under international law," the federal government exerts "significant" "authority to exercise restraining and directing influence over the EEZ." *Administration of Coral Reef Resources in the Northwest Hawaiian Islands*, 24 Op. O.L.C. 183, 196–97 (2000) ("OLC Op."). That power includes "substantial authority" to achieve the specific goal advanced here: "protecting the marine environment." *Id*. at 197.

Second, the federal government possesses substantial authority over the EEZ under domestic law. As noted, *supra* at 6, the Reagan Proclamation established U.S. sovereign dominion over the EEZ "for the purpose of exploring,

exploiting, conserving and managing natural resources, both living and non-living, of the seabed and subsoil and the superjacent waters," as well as "jurisdiction with regard to . . . the protection and preservation of the marine environment." Reagan Proclamation, 3 C.F.R. at 23. Consistent with that authority, Congress has enacted several statutes regulating extraction and conservation activities in the EEZ, including the Sanctuaries Act, the Magnuson-Stevens Act, and the Outer Continental Shelf Lands Act.

And finally, the federal government exercises unrivaled authority over the EEZ. Although other nations may exercise "the freedoms of navigation and overflight" as well as the "freedom to lay submarine cables and pipelines" in the EEZ, Restatement § 514(2), no other entity matches the "extensive" "restraining and directing influence" exerted by the federal government, OLC Op. at 196–97. No private entity owns any portion of the EEZ, and no public entity possesses equivalent sovereign rights there. Indeed, the Supreme Court recently explained that "the Federal Government exercise[s] exclusive" authority over this portion of the ocean. *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019).

The federal government's unrivaled authority under both international and domestic law establishes that it "control[s]" the EEZ for purposes of the Act. The Fishermen's remaining arguments to the contrary are unavailing.

The Fishermen first invoke *Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330 (5th Cir. 1978), where the Fifth Circuit held that the remains of a newly-discovered shipwreck "on the continental shelf, outside the territorial waters of the United States" was "not situated on lands owned or controlled by the United States

under the provisions of the Antiquities Act." *Id*. at 333 n.1, 340. The Fishermen argue that *Treasure Salvors*' "logic requires the same conclusion in this case: that the [M]onument is not located on land owned or controlled by the federal government." Appellants' Br. 51. But *Treasure Salvors* predated the Reagan Proclamation and thus never addressed whether the federal government exercises control over the U.S. EEZ. Accordingly, the decision carries no significance here.

Lastly, warning of a slippery slope, the Fishermen insist that if the Act reaches the EEZ, then it also reaches "areas clearly meant to be excluded, such as state and private lands." Appellants' Reply Br. 32. But no such danger lurks in the shadows of this opinion. The federal government controls the EEZ, in part, because no other entity—public or private— exerts competing influence there; the federal government's authority is "exclusive." *Parker*, 139 S. Ct. at 1887. That, however, is not true of state and private lands, where other entities—namely, states and private parties—possess competing authority, weakening any federal government claim to exercise control over such lands.

## D.

This brings us to the Fishermen's final argument: that the Monument is not, as required by the Act, the "smallest area compatible" with management. 54 U.S.C. § 320301(b). In *Tulare County*, we set forth the type of allegations required to make out such a claim. That case concerned Giant Sequoia National Monument, which protects "groves of giant sequoias, the world's largest trees, and their surrounding ecosystem." *Tulare County*, 306 F.3d at 1140. Challengers questioned the monument's boundaries, arguing that they were larger than necessary because "[s]equoia groves comprise[d] only six percent of the [m]onument['s]" area. *Tulare County v. Bush*,

317 F.3d 227, 227 (D.C. Cir. 2003) (*per curiam*). We concluded that the challengers failed to state a claim because the proclamation protected "natural resources present throughout the [m]onument area," meaning "[i]t was . . . incumbent upon [the challengers] to allege that some part of the [m]onument did not, in fact, contain natural resources that the President sought to protect." *Id*. The six-percent allegation, we speculated, "might well have been sufficient if the President had identified only [s]equoia groves for protection, but he did not," *id*.; he also protected "their surrounding ecosystem," *Tulare County*, 306 F.3d at 1140.

The Fishermen's pleadings are similarly insufficient. They allege only that the Monument reserves large areas of submerged land beyond the canyons and seamounts. Although those allegations "might well have been sufficient if the President had identified only [the canyons and seamounts] for protection, . . . he did not." *Tulare County*, 306 F.3d at 227. Instead, the Monument protects not only "the canyons and seamounts themselves," but also "the natural resources and ecosystems in and *around them*." Monument Proclamation, 3 C.F.R. at 262 (emphasis added). "It was therefore incumbent upon [the Fishermen] to allege that some part of the Monument did not, in fact, contain natural resources that the President sought to protect." *Tulare County*, 306 F.3d at 227. The Fishermen failed to do so: the complaint contains no factual allegations identifying a portion of the Monument that lacks the natural resources and ecosystems the President sought to protect.

Grasping at straws, the Fishermen assert that "[a]n ecosystem is not an 'object' under the Antiquities Act." Compl. ¶ 75, Joint Appendix 24–25. In *Tulare County*, however, we expressly held that ecosystems are protectable "objects" under the Act: "[i]nclusion of such items as ecosystems . . . in the

Proclamation did not contravene the terms of the statute by relying on nonqualifying features." 306 F.3d at 1142; *cf. Alaska*, 545 U.S. at 99 (explaining that the President "create[d] Glacier Bay National Monument," in part, to protect "the complex ecosystem of Glacier Bay"). Accordingly, the Fishermen's smallest-area claim fails.

## III.

We end with a housekeeping matter. Although the district court properly found that the Fishermen "failed to demonstrate that the President acted outside his statutory authority" in creating the Monument, it deemed such failure "jurisdictional" and dismissed the complaint "under Rule 12(b)(1), rather than Rule 12(b)(6)." *Lobstermen's Association*, 349 F. Supp. 3d at 55. To be fair, we have been less than precise about the basis for dismissing Antiquities Act cases. *See, e.g.*, *Tulare County*, 306 F.3d at 1140 (dismissing "for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)"). We now clarify that where, as here, plaintiffs fail to make out legally sufficient claims challenging national monument designations, those claims should be dismissed pursuant to Rule 12(b)(6). Because district courts possess subject-matter jurisdiction over challenges to Antiquities Act designations under 28 U.S.C. § 1331, dismissal of such challenges pursuant to Rule 12(b)(1) is inappropriate. *See Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006) (explaining that where litigants challenge the executive's exercise of statutory authority, "[s]ection 1331 is an appropriate source of jurisdiction"). Accordingly, "[a]lthough the district court erroneously dismissed the action pursuant to Rule 12(b)(1), we c[an]"—and do—"nonetheless affirm" the district court's dismissal of the Fishermen's complaint "based on failure to state a claim under Federal Rule of Civil Procedure

18

12(b)(6).” *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

*So ordered.*

**Figure 1**

