**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MURPHY COMPANY, an Oregon
corporation; MURPHY TIMBER
INVESTMENTS, LLC, an Oregon
limited liability company,
             *Plaintiffs-Appellants,*

  v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United
States of America; DEBRA A.
HAALAND, in her official capacity as
Secretary of Interior; U.S.
DEPARTMENT OF THE INTERIOR,
             *Defendants-Appellees,*

SODA MOUNTAIN WILDERNESS
COUNCIL; KLAMATH-SISKIYOU
WILDLANDS CENTER; OREGON
WILD; WILDERNESS SOCIETY,
             *Intervenor-Defendants-
             Appellees.*

No. 19-35921

D.C. No.
1:17-cv-00285-CL

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted August 30, 2022
Seattle, Washington

Filed April 24, 2023

Before:  M. Margaret McKeown and Richard C. Tallman,
Circuit Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Tallman

## SUMMARY[**]

### Antiquities Act / Presidential Proclamation

The panel affirmed the district court's summary judgment in favor of the United States and intervenor environmental organizations in an action brought by Murphy Timber Company challenging Presidential Proclamation 9564, which was issued under the Antiquities Act, and expanded the Cascade-Siskiyou National Monument in southwestern Oregon.

The Antiquities Act grants the President broad authority to create, by presidential proclamation, national monuments from federal lands to protect sites of historic and scientific

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

interest. The Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act ("O&C Act") addresses the use of timberlands in the southwest corner of Oregon.

Murphy, an Oregon timber business, sought declaratory and injunctive relief, and claimed that the Proclamation was an invalid exercise of the Antiquities Act because it offended the O&C Act's promise to reserve certain lands for timber production. A collection of environmental organizations intervened to defend the Proclamation.

The panel first considered whether Murphy's claim of *ultra vires* and unconstitutional action with respect to the Proclamation was immune from judicial review. In the absence of a statutory waiver, the Supreme Court has permitted judicial review of presidential actions in two circumstances. First, the Court has recognized constitutional challenges to presidential acts as reviewable. Second, the Court has held that actions by subordinate Executive Branch officials that extend beyond delegated statutory authority— *i.e., ultra vires* actions—are reviewable. Whether characterized as *ultra vires* or constitutional, the panel held that Murphy's claims against the President regarding Proclamation 9564 were justiciable. Here, the core of Murphy's claim—that the President violated separation of powers by directing the Secretary of Interior to act in contravention of a duly enacted law—could be considered constitutional and therefore reviewable. The panel concluded that Murphy's particularized allegations that the O&C Act restricts the President's designation powers under the Antiquities Act satisfied the applicable jurisdictional standard.

Next, the panel evaluated whether the Proclamation's restriction on logging was consistent with the O&C

Act.  Murphy alleged that the O&C Act's directive of "permanent forest production" circumscribed the scope of presidential authority over these specific lands.  First, the panel held that the O&C Act did not explicitly or impliedly repeal the Antiquities Act.  Nothing supports a claim that the Antiquities Act proclamations are broadsides at land-management laws and cannot coexist with preexisting congressional mandates.  The panel held that there was no basis to suggest that Congress intended the O&C Act to nullify the Antiquities Act—which was itself an act of Congress.  Second, the panel held that the Proclamation's exercise of Antiquities Act power was consistent with the text, history, and purpose of the O&C Act.  Timber production was not the sole purpose that Congress envisioned for the more than two million acres of O&C lands.  Congress delegated ample discretion to the Department of the Interior to manage the lands in a flexible manner.  Third, the panel held that the dissent's concerns that the Proclamation and the O&C Act are in conflict are unsubstantiated.   The panel concluded that the Proclamation was a valid exercise of the President's Antiquities Act authority, and the Proclamation was fully consistent with the O&C Act.

Judge Tallman concurred in part because he agreed that the court could review claims that the President's execution of one statute obstructed the operation of another.  However, he dissented from the majority's conclusion that Proclamation 9564 did not conflict with the O&C Act.  He wrote that the issue of whether the Antiquities Act and the O&C Act can coexist in the abstract is beside the point.  Rather, the court must decide whether Proclamation 9564—issued pursuant to the Antiquities Act—conflicts with the O&C Act.  A review of the plain text of the Proclamation

and the O&C Act reveals an obvious conflict. The O&C Act requires sustained yield calculation for all O&C timberlands. Proclamation 9564 removes O&C timberlands from the sustained yield calculation if they fall within the monument. By expressly singling out sustained yield calculation for prohibition, the President's proclamation intentionally directs the Secretary to disregard her statutory duties under the O&C Act to make sure that timber is available for harvest to meet economic needs of timber-dependent communities. Judge Tallman wrote that he would give effect to the plain meaning of the O&C Act and declare the Proclamation void as to O&C timberland.

## COUNSEL

Julie A. Weis (argued) and Michael E. Haglund, Haglund Kelley LLP, Portland, Oregon, for Plaintiffs-Appellants.

Robert J. Lundman (argued), Coby Howell, Brian C. Toth, and Mark R. Haag, Attorneys; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Washington, D.C.; Laura Damm and Brian Perron, Attorneys; United States Department of the Interior; Washington, D.C.; for Defendants-Appellees.

Kristen L. Boyles and Ashley N. Bennett, Earthjustice, Seattle, Washington; Susan Jane M. Brown, Western Environmental Law Center, Portland, Oregon; for Intervenor-Defendants-Appellees.

## OPINION

McKEOWN, Circuit Judge:

This case calls on us to consider the intersection of the Antiquities Act, adopted in 1906, and the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act ("O&C Act"), adopted in 1937.  The Antiquities Act grants the President broad authority to create, by presidential proclamation, national monuments from federal lands to protect sites of historic and scientific interest.  *See* 54 U.S.C. § 320301(a)–(b).   In contrast, the O&C Act is much narrower in scope, addressing the use of timberlands in the southwest corner of Oregon.  *See* 43 U.S.C. § 2601 *et seq.*

In January 2017, President Obama issued a Proclamation under the Antiquities Act expanding the Cascade-Siskiyou National Monument ("Monument") in southwestern Oregon.  Proclamation 9564 ("Proclamation"), 82 Fed. Reg. 6145 (Jan. 12, 2017).  First established in 2000 by President Clinton, the Monument boasts "an incredible variety of species and habitats," which form "a rich mosaic of forests, grasslands, shrublands, and wet meadows."  *Id.*   The expanded Monument's 101,000 acres, which intersect with the ancestral homes of several Native American peoples, also overlap with timberlands regulated by the O&C Act. With limited exceptions, logging is banned within the Monument.

Murphy Timber Company and Murphy Timber Investments, LLC (collectively, "Murphy") are Oregon timber businesses.  Murphy owns woodlands and purchases timber harvested in western Oregon to supply its wood-products manufacturing facilities.   Concerned that the Proclamation imposed a new limitation on its timber supply

and deleterious effects on its woodlands adjacent to the expanded Monument, Murphy sued the President, the Secretary of the Interior ("Secretary"), and the Bureau of Land Management ("BLM") seeking declaratory and injunctive relief. Although Murphy named the Secretary and BLM as defendants, the suit does not challenge any specific, final agency action. Murphy claims that the Proclamation is an invalid exercise of the Antiquities Act because it offends the O&C Act's promise to reserve certain lands for timber production. A collection of environmental organizations (together, "Soda Mountain") intervened to defend the Proclamation.

The dispute poses two questions for our review. We first consider whether Murphy's claim of *ultra vires* and unconstitutional action with respect to the Proclamation is immune from judicial review. Because we conclude that we have jurisdiction to hear Murphy's challenge, we next evaluate whether the Proclamation's restriction on logging is consistent with the O&C Act. Admittedly, the validity of the Proclamation—an Antiquities Act order that implicates the O&C Act—presents a statutory thicket. But, ultimately, Murphy's claim of irreconcilability misses the forest for the trees. The Antiquities Act and the later-enacted O&C Act are not irreconcilable, nor did the O&C Act repeal the Antiquities Act. The Proclamation is consistent with the O&C Act's flexible land-management directives, which incorporate conservation uses. And, notably, only a tiny percentage of the several million acres covered by the O&C Act ("O&C Lands") fall within the expanded Monument's territory. The Secretary retains broad discretion over the millions of acres remaining. The Proclamation does not usurp congressional intent or the Secretary's authority to regulate the O&C Lands as a whole. We affirm the district

court's grant of summary judgment in favor of the United States and Soda Mountain.

## I. BACKGROUND

### A. THE ANTIQUITIES ACT AND PROCLAMATION 9564

The Antiquities Act delegates to Presidents, in their "discretion," the power to designate "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest" as national monuments and to "reserve parcels of land" for protection. 54 U.S.C. § 320301(a)–(b). The meaning of "monument" under the statute encompasses mountains and deserts, as much as it does physical statues or icons. *See* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 477–86 (2003). Indeed, Theodore Roosevelt, the President at the time of the Act's passage and a noted conservationist, designated eighteen monuments spanning approximately 1.5 million acres under this new law. *See id.* at 474 n.6. In the years since, all but three Presidents have exercised their Antiquities Act authority. *National Monument Facts and Figures*, Nat'l Park Serv., https://www.nps.gov/subjects/archeology/national-monume nt-facts-and-figures.htm (last updated Mar. 27, 2023). Proclamations by Presidents Obama, Trump, and Biden have brought the total number of national monument enactments to 161. *Id.* President Biden recently announced two new monuments: the Avi Kwa Ame National Monument in Nevada and the Castner Range National Monument in Texas. White House Statements and Releases (Mar. 21, 2023).

This case concerns one such set of designations. In June 2000, President Clinton reserved nearly 53,000 acres of federal land as the Cascade-Siskiyou National Monument

for its "spectacular" biodiversity. Proclamation 7318, 65 Fed. Reg. 37249, 37249 (June 9, 2000). The President proclaimed, "[w]ith towering fir forests, sunlit oak groves, wildflower-strewn meadows, and steep canyons, the Cascade-Siskiyou National Monument is an ecological wonder, with biological diversity unmatched in the Cascade Range." *Id.* Logging was banned within the Monument except in limited circumstances:

> The commercial harvest of timber or other vegetative material is prohibited, except when part of an authorized science-based ecological restoration project aimed at meeting protection and old growth enhancement objectives. Any such project must be consistent with the purposes of this proclamation. No portion of the monument shall be considered to be suited for timber production, and no part of the monument shall be used in a calculation or provision of a sustained yield of timber. Removal of trees from within the monument area may take place only if clearly needed for ecological restoration and maintenance or public safety.

*Id.* at 37250.

In 2011, a group of scientists issued a report finding that expanding the Monument was "required to fully protect the unique biological diversity of the area." Many local Oregonians expressed their support for the scientists' expansion plan. Heeding their call, President Obama in 2017 issued Proclamation 9564, expanding the Monument by approximately 48,000 acres. 82 Fed. Reg. at 6145, 6148.

The expansion provided "habitat connectivity corridors for species migration and dispersal" to better permit the Monument's diverse species to be "resilient to large-scale disturbance such as fire, insects and disease, invasive species, drought, or floods." *Id.* at 6145. Further, the Proclamation prohibited logging within the expanded area. *Id.* at 6148–49. Both the original Monument and its expansion overlap in part with the land managed under the O&C Act. Though the parties offer competing calculations about what constitutes "timberland," the precise degree of overlap is not consequential to our decision. Following the Proclamation, BLM—the agency within the Department of the Interior ("Department") responsible for administering federal lands—halted timber sales within the expanded Monument.

## B. THE O&C ACT

The O&C Act descends from the fraught history of America's westward expansion, punctuated as it was by the exploitation of natural resources and federal money. In 1866, the United States made a grant of purportedly "public lands" to private railroad companies to facilitate the construction of a rail line between Oregon and California. *Clackamas County v. McKay*, 219 F.2d 479, 481, 484 (D.C. Cir. 1954) (citing Act of July 25, 1866, ch. 242, 14 Stat. 239), *judgment vacated as moot*, 349 U.S. 909 (1955). Congress in 1869 directed the railroads to sell the granted land to "actual settlers only." Act of Apr. 10, 1869, ch. 27, 16 Stat. 47. But the railroads violated the terms of the grant and, by 1893, had failed to dispose of the vast majority of the parcels. *See Clackamas*, 219 F.2d at 482; Richard White, *Railroaded: The Transcontinentals and the Making of Modern America* 459 (2011).

Consequently, in 1916, Congress revested much of the land and directed the Secretary to sell the timber "as rapidly as reasonable prices can be secured." Act of June 9, 1916, Pub. L. No. 86, ch. 137, 39 Stat. 218, 220. But the 1916 Act was "more a triumph of expediency than a statesmanlike solution," and its convoluted timber-for-taxes funding scheme left many Oregon counties in "dire financial straits." David Maldwyn Ellis, *The Oregon and California Railroad Land Grant, 1866-1945*, 39 Pac. N.W. Q. 253, 273, 275 (1948). In 1926, Congress's next attempt at alleviating the financial burden also failed, merely shifting the debts from the counties onto the U.S. Treasury. Act of July 13, 1926, Pub. L. No. 523, ch. 897, 44 Stat. 915; Ellis, *supra*, at 275.

Finally, in 1937, Congress passed the O&C Act to remedy in part the region's perilous economic and environmental situation. *Clackamas*, 219 F.2d at 485–86. The O&C Act provided "for the management of the timber on a conservation basis," and accorded significant discretion to the Secretary of the Interior when it came to "classification of land" and "sale of timber." *Id.* at 487. The statute reads, in part:

> [S]uch portions of the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant lands as are or may hereafter come under the jurisdiction of the Department of the Interior, which have heretofore or may hereafter be classified as timberlands, and power-site lands valuable for timber, shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [*sic*] of

> sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties [*sic*].

43 U.S.C. § 2601. The statute's remaining sections detail the Secretary's duties and discretion to limit the Lands' annual timber capacity in compliance with the principle of sustained yield. *Id.*

In the decades since, BLM has managed the more than two million acres of O&C Lands in keeping with changing conditions. For instance, the annual amount of timber that BLM allows to be sold has fluctuated, starting at 500 million board feet per year in 1937, peaking at more than 1 billion board feet in 1972, and hitting a low of 13 million board feet in 1994. Katie Hoover, Cong. Rsch. Serv. R42951, *The Oregon and California Railroad Lands (O&C Lands): Issues for Congress* 3, 5 fig. 3 (2015). The contested lands are but a small fraction of the vast acreage managed by BLM. In addition to timber management, BLM has guided conservation activities on the O&C Lands. BLM regulations, adopted to implement the O&C Act, have authorized the agency to "preserve, protect, and enhance areas of scenic splendor, natural wonder, scientific interest, primitive environment, and other natural values for the enjoyment and use of present and future generations." *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489, 1506 (D. Or. 1992) (quoting 43 C.F.R. § 6220.0-1), *modified*, 1992 WL 176353 (D. Or.), *and aff'd sub nom. Portland Audubon Soc'y v. Babbitt*, 998 F.2d 705 (9th Cir. 1993). Following the Monument's designation and expansion,

BLM removed Monument lands from its analyses of annual sustained yield and halted logging on those lands.  To date, BLM has offered one timber sale within the original Monument in accordance with Proclamation 7318's provision for such harvest if it is "clearly needed for ecological restoration and maintenance or public safety." *See* 65 Fed. Reg. at 37250.

### C. THIS LITIGATION

In February 2017, Murphy brought suit in the District of Oregon seeking declaratory and injunctive relief against the President, the Secretary, and BLM.  Murphy alleged that President Obama's Proclamation 9564 designation of O&C Lands as Monument land violated the "timber production purpose" of the O&C Act and the President therefore lacked authority under the Antiquities Act to do so.  Murphy also claimed that the Proclamation's restrictions on logging also pose increased risks of wildfire and insect infestation.  For relief, Murphy requested vacatur of the Proclamation as to the O&C Lands in the expansion, an injunction requiring the government to manage O&C Lands exclusively pursuant to the O&C Act, and a declaration as to the Proclamation's invalidity.  Soda Mountain Wilderness Council and other environmental organizations intervened.

In June 2017, the district court stayed the litigation after President Trump directed the Secretary of the Interior to review certain prior Antiquities Act designations, including the Monument expansion.  The Secretary recommended reducing the size of the Monument, but President Trump did not act on the recommendations.  No final agency action emerged from this review.  Eventually, the district court lifted the stay in February 2018, and all parties moved for summary judgment.  The government argued that sovereign

immunity bars Murphy's claim against the President and that the Proclamation and the O&C Act do not irreconcilably conflict. Granting summary judgment for the United States and Soda Mountain, the district court concluded that it had jurisdiction to review whether the President had acted *ultra vires* and held that the Proclamation was consistent both with the President's Antiquities Act authority and with the O&C Act's land-management directives.

## II. ANALYSIS

### A. JUSTICIABILITY

Before addressing the merits of Murphy's statutory claims, we first consider whether we have authority to do so. Sovereign immunity generally bars suits against the United States and its officials sued in their official capacity unless Congress has expressly waived immunity by statute. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Where Congress has not waived sovereign immunity, judicial review is never available "when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). In the absence of a statutory waiver, the Supreme Court has permitted judicial review of presidential actions in two circumstances.

First, the Court has recognized constitutional challenges to presidential acts as reviewable. In *Franklin v. Massachusetts*, the state of Massachusetts and two of its registered voters sued the President, the Secretary of Commerce, Census Bureau officials, and the Clerk of the House of Representatives over reapportionment policy, particularly regarding the method used for counting federal employees serving overseas. 505 U.S. 788, 790–91 (1992). The Court held that the President's actions could "be reviewed for constitutionality," even though they were "not

reviewable for abuse of discretion" under the Administrative Procedure Act. *Id.* at 801; *see also Dalton*, 511 U.S. at 467–72 (reaffirming the *Franklin* principle that "Presidential decisions are reviewable for constitutionality" but clarifying that not all claims alleging action in excess of statutory authority are "*ipso facto* in violation of the Constitution").

Second, the Court has held that actions by subordinate Executive Branch officials that extend beyond delegated statutory authority—*i.e.*, *ultra vires* actions—are reviewable. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90 (1949). In *Larson*, the case in which this theory was first articulated, a corporate plaintiff sued the head of the War Assets Administration in the wake of World War II, alleging the government breached a contract to sell the corporation its surplus coal. *Id.* at 684. Although the plaintiff's suit was "nominally addressed to" the Administrator, the Court affirmed dismissal on sovereign immunity grounds because it was "in substance, a suit against the Government." *Id.* at 687–90. But in reaching this conclusion, the Court articulated an important exception: sovereign immunity does not shield an executive officer from suit for actions in "conflict with the terms of his valid statutory authority." *Id.* at 695; *see also Dalton*, 511 U.S. at 472 (underscoring that "sovereign immunity [does] not shield an executive officer from suit if the officer acted either 'unconstitutionally *or* beyond his statutory powers.'" (quoting *Larson*, 337 U.S. at 691 n.11)).

Here, as a threshold matter, the United States urges that Proclamation 9564 is immune from judicial review. The government argues that because no statute waives sovereign immunity or provides a cause of action for Murphy's claims, statutory judicial review is unavailable. Next, the government contends that even *ultra vires* review of

Murphy's statutory claim is unavailable because the President acted pursuant to authority delegated by Congress under the Antiquities Act, and the O&C Act does not regulate the President's discretion, only that of the Secretary of the Interior. Murphy does not dispute that the Antiquities Act grants the President the authority to designate national monuments; instead, Murphy contends that Proclamation 9564, in particular, is reviewable as an *ultra vires* act. Because the O&C Act places a "reviewable limit" on the President's authority to designate monuments under the Antiquities Act, Murphy argues, *Larson* creates an exception to sovereign immunity that allows jurisdiction.

Although neither the Supreme Court nor the Ninth Circuit has directly addressed whether the *Larson* exception applies to actions by the President, apart from the actions of subordinate Executive Branch officials, precedent and principle point in favor of jurisdiction here. The reviewability of Murphy's claim that the Secretary cannot manage O&C Lands contrary to the O&C Act is a simpler question. Yet, because Murphy's claims against the Secretary and against the President are thoroughly interwoven, the justiciability of each demands a judicial answer. Murphy's complaint is not pristinely clear about the appropriate avenue to jurisdiction. In addition to Murphy's arguments under *Larson*, Murphy's challenge implicates separation of powers concerns that resonate with the constitutional claims recognized in *Franklin*. Yet, whether characterized as *ultra vires* or constitutional, the result is the same: we resolve that Murphy's claims against the President regarding Proclamation 9564 are justiciable.

When faced with such a "difficult question" of the reviewability of certain executive actions, the Supreme Court has in recent years adopted the practice of "assum[ing]

without deciding" justiciability. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018); *see also id.* at 2407 (noting that the Court in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), "went on to consider on the merits a statutory claim like the one before us without addressing the issue of reviewability"). But relying only on "hypothetical jurisdiction" risks rendering the disposition "nothing more than a hypothetical judgment" and thereby diluting the separation of powers. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998). Here, Murphy does not allege that Proclamation 9564 constituted an abuse of discretion beyond the Antiquities Act guidelines; rather, Murphy maintains that the President's exercise of discretion under the Antiquities Act independently violates the O&C Act. In other words, Murphy's claim asks only that we apply our familiar tools of statutory construction and fulfill our enduring "duty . . . to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Longstanding judicial practice, therefore, urges that we explicitly decide the issue of justiciability in this case.

Contemporary Ninth Circuit jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton*. In *Sierra Club v. Trump*, for example, we held that a challenge to presidential action will be considered constitutional, and therefore justiciable under *Franklin*, so long as a plaintiff claims that the President has "violat[ed] . . . constitutional separation of powers principles" because the President's action lacked both "statutory authority" and "background constitutional authority." 929 F.3d 670, 696–97 (9th Cir. 2019); *see also Sierra Club v. Trump*, 963 F.3d 874, 889–90 (9th Cir. 2020) (reiterating that claims alleging the President violated the Constitution by exceeding statutory authority

are justiciable as constitutional claims), *vacated and remanded on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). While "an action taken by the President in excess of his statutory authority [does not] necessarily violate[] the Constitution," *Dalton*, 511 U.S. at 473, specific allegations regarding separation of powers may suffice. Here, the core of Murphy's claim—that the President violated separation of powers by directing the Secretary to act in contravention of a duly enacted law— could be considered constitutional and therefore reviewable.

The D.C. Circuit has had occasion to review analogous cases concerning the reviewability of claims against the President. In *Chamber of Commerce v. Reich*, plaintiffs challenged President Clinton's executive order, issued pursuant to his Procurement Act authority, that barred the federal government from contracting with employees replacing striking workers. 74 F.3d 1322, 1324 (D.C. Cir. 1996). The court determined that it had jurisdiction to review plaintiffs' claims that the order constituted "a palpable violation" of the National Labor Relations Act. *Id.*

In two other cases, the D.C. Circuit acknowledged jurisdiction over *ultra vires* allegations but ultimately concluded that the claims failed because of insufficient factual allegations. Plaintiffs in *Mountain States Legal Foundation v. Bush* challenged the creation of six national monuments, alleging the President acted *ultra vires* under the Antiquities Act and contrary to other federal statutes. 306 F.3d 1132, 1133–34 (D.C. Cir. 2002). The D.C. Circuit explained that *Dalton*'s restriction on reviewing presidential acts for abuse of discretion "'is inapposite' . . . 'where the claim instead is that the presidential action . . . independently violates' another statute." *Id.* at 1136 (quoting *Reich*, 74 F.3d at 1332). The court proceeded to

review and reject plaintiffs' argument that the presidential action did indeed independently violate another statute, thus affirming dismissal on the merits for failure to state a claim. *Id.* at 1138. Applying this standard, the D.C. Circuit in *Massachusetts Lobstermen's Association v. Ross* concluded that plaintiffs' claims "that interpreting the Antiquities Act to permit ocean-based monuments would render the Sanctuaries Act a practical nullity" were justiciable but without merit. 945 F.3d 535, 541, 544 (D.C. Cir. 2019) (internal quotation marks omitted), *cert. denied sub nom. Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979 (2021).

Against this backdrop, Murphy's allegations are sufficient to establish jurisdiction. Our resolution should not be read to empower future objectors to frame any unpopular presidential action as "*ultra vires*" and thus open the floodgates to frivolous judicial challenges that hinder the President's power to respond to pressing issues. The Supreme Court has emphasized that dismissal for lack of jurisdiction is warranted if the alleged claim of statutory excess is made "solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous." *See Larson*, 337 U.S. at 690 n.10. And, again, the Court has stipulated that not every *ultra vires* claim will necessarily implicate constitutional concerns. *See Dalton*, 511 U.S. at 472. As the D.C. Circuit held in *Mountain States Legal Foundation*, plaintiffs advancing *ultra vires* claims must plead "plausible factual allegations identifying an aspect of the designation that exceeds the President's statutory authority." 306 F.3d at 1136–37. Far from providing "only the bald assertion that the President acted outside the bounds of his . . . statutory authority," *id.* at 1137, Murphy's particularized allegations that the O&C Act restricts the

President's designation powers under the Antiquities Act satisfies the jurisdictional standard set forth here and elsewhere.[1]

## B. THE ANTIQUITIES ACT'S CONSISTENCY WITH THE O&C ACT

No party challenges President Obama's general authority to expand the Monument under the Antiquities Act. And for good reason—that authority is not inconsistent with the scope of the O&C Act. Murphy urges that the O&C Act's directive of "permanent forest production" circumscribed the scope of presidential authority over these specific lands. But Murphy overreads the extent of congressional commitment to timber production in the O&C Act and improperly discounts the considerable discretion that the statute grants the Department in managing O&C Lands for uses other than timber. After reviewing the O&C Act's plain text and legislative history, we hold that the Proclamation is a valid exercise of the President's Antiquities Act authority.

---

[1] Our conclusion that Murphy has credibly alleged a statutory conflict does not dictate our determination on the merits. The pleading burdens with respect to jurisdiction and the merits are not coterminous when the claim is that the challenged action violates a separate statute conferring no authority on the President. *See Reich*, 74 F.3d at 1330–31 (stressing that "it is important carefully to distinguish between the government's argument on the merits and its non-reviewability claim" in *ultra vires* suits involving two or more statutes because the fact that a statute affords the President "broad authority"—though weighing heavily on the merits—does not "preclude[] judicial review of executive action for conformity with that statute—let alone review to determine whether that action violates another statute.").

### 1. The O&C Act did not repeal the Antiquities Act.

The O&C Act did not explicitly or implicitly repeal the Antiquities Act. To begin, the two statutes are directed at different officials: the Antiquities Act vests authority in the President, while the O&C Act concerns the Secretary and says nothing about presidential authority. *See Sale*, 509 U.S. at 171–79 (considering statutes' direction at different officials as a persuasive factor in reconciling a statute and an executive order). Nor does the O&C Act make any reference to the preexisting Antiquities Act. The Supreme Court has counseled, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). The Antiquities Act and the O&C Act are easily "capable of co-existence."

Lacking any evidence of an explicit repeal, Murphy contends that the Antiquities Act and the O&C Act are irreconcilable because the latter act's *non-obstante* clause implicitly repealed the President's power under the Antiquities Act. By its terms, that *non-obstante* clause applies only if there is a statutory conflict: "All Acts or parts of Acts in conflict with this Act are hereby repealed to the extent necessary to give full force and effect to this Act." *See* Act of Aug. 28, 1937, ch. 876, 50 Stat. 876. Murphy "faces a stout uphill climb" against the "strong presumption that repeals by implication are disfavored." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (internal quotation marks omitted). In urging that the Antiquities Act and the O&C Act "cannot be harmonized," Murphy "bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Id.* (internal

quotation marks omitted). Murphy points to no such evidence of congressional intent to repeal the Antiquities Act. In fact, the O&C Act's legislative history does not contain any reference to the Antiquities Act, even though the 1906 law was hardly itself an antiquity by 1937, when the O&C Act came into existence. President Franklin Delano Roosevelt exercised his monument-making power eight times that year alone. *National Monument Facts and Figures*, *supra*. Rather, the legislative record supports that Congress likely included the *non-obstante* clause as a fail-safe to ensure that the 1937 O&C Act superseded the tangle of statutes that had previously regulated the O&C Lands. *See* H.R. Rep. No. 75-1119, at 2–4 (1937).

When Congress has wished to restrict the President's Antiquities Act authority, it has done so expressly. Consider, for instance, the highly public dispute between Congress and President Roosevelt over the establishment of the Jackson Hole National Monument in 1943. That year, President Roosevelt proclaimed 221,610 acres of federal land in Wyoming as a national monument of historic significance under the Antiquities Act, brushing aside strong indications from Congress that they would disapprove of such a move. *See* Robert W. Righter, *Crucible for Conservation: The Creation of Grand Teton National Park* 109–10 (1982). Opposition to the monument was fierce, and Congress reacted almost immediately: it appointed a joint congressional committee to investigate the issue, and, a few years later, it passed legislation that prohibited "further extension or establishment of national parks or monuments in Wyoming" without "express authorization" from Congress. *See* Act of Sept. 14, 1950, Pub. L. No. 787, § 1, 64 Stat. 849, 849; *see also* Righter, *supra*, 110–19, 123–25. To take another example, in response to President Carter in

1978 establishing more than 50 million acres across Alaska as national monuments, Congress passed a law requiring that the President seek congressional approval for land withdrawals larger than 5,000 acres throughout the *entire* state. *See* Act of Dec. 2, 1980, Pub. L. No. 96-487, § 1326(a), 94 Stat. 2371, 2488. Here, there is every reason to believe that if Congress had intended the restrictions of the O&C Act to apply when the President shifted the land use in question, Congress would speak as clearly and promptly here as it did in the cases of Alaska and Wyoming. But no such action was here taken.

More broadly, the fact that the Supreme Court has never overturned an Antiquities Act proclamation underscores the statute's vitality. *See United States v. California*, 436 U.S. 32, 35–36 (1978) (confirming the President's Antiquities Act power to add federally controlled lands to an existing monument); *Cameron v. United States*, 252 U.S. 450, 455 (1920) (affirming the President's authority under the Antiquities Act to create a Grand Canyon National Monument); *see also Cappaert v. United States*, 426 U.S. 128, 141–42 (1976) (holding that the "language of the [Antiquities] Act . . . is not so limited" and includes the authority to reserve rights to unappropriated water within a national monument). In one such historical case, the Court noted that the scope of President Truman's enlargement of a national monument in California was "a question only of Presidential intent, not of Presidential power." *United States v. California*, 436 U.S. at 36.

Thus, nothing supports a claim that the Antiquities Act proclamations are broadsides at land-management laws and cannot coexist with preexisting congressional mandates. There is no basis to suggest that Congress intended the O&C

Act to nullify the Antiquities Act—which was, after all, itself an act of Congress.

### 2. The Proclamation's Exercise of Antiquities Act Power is Consistent with the Text, History, and Purpose of the O&C Act.

The Proclamation's exercise of Antiquities Act power is consistent with the O&C Act. The O&C Act's text, history, and purpose are clear that timber production was not the sole purpose that Congress envisioned for the more than two million acres of O&C Lands. Congress delegated ample discretion to the Department of the Interior to manage the lands in a flexible manner.

### a. Text

When "the meaning of the statute's terms is plain," the court's job "is at an end." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1749 (2020). Here, the O&C Act's plain language empowers the Department to classify and manage the revested and reconveyed lands for several purposes—predominantly, but not exclusively, timber production. We cannot ignore the conservation provisions of the Act. As the D.C. Circuit long ago recognized, the O&C Act "conferred upon the Secretary of the Interior many duties requiring the exercise of his discretion and judgment." *Clackamas*, 219 F.2d at 487. The opening paragraph of the O&C Act reveals the breadth of congressional purpose:

> [S]uch portions of the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant lands as are or may hereafter come under the jurisdiction of the Department of the Interior, *which have heretofore or may hereafter be classified as*

*timberlands*, and power-site lands valuable for timber, shall be managed ... for permanent *forest production*, and the timber thereon shall be sold, cut, and removed in conformity with the principal [*sic*] of sustained yield *for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties* [*sic*].

43 U.S.C. § 2601 (emphasis added).

The first italicized provision indicates that not *all* O&C Lands were to be operated as timberlands. Instead, the statute directs the Department to determine *which portions* of the land should be set aside for logging and which should be reserved. The Department's duty to oversee the lands is obligatory ("shall be managed"), but treating *every* parcel as timberland is not. Reading the statute differently would render the "heretofore" phrase mere surplusage and "run[] afoul of the 'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Murphy concedes as much in acknowledging that "[s]ome O&C Act lands are not subject to the statutes' sustained-yield timber production mandates." Obviously, Murphy can't pick and choose which parcels should be classified as protected timberlands. Otherwise, Murphy's argument would place the court or the timber company in the driver's seat and divest the Department of authority to make

dynamic, scientific decisions about which parcels should or should not be logged.

Importantly, the statute authorizes the Department to manage the O&C Lands for uses other than timber production. While "providing a permanent source of timber supply" is certainly primary, the Act delineates a number of purposes for the Lands: "protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties." 43 U.S.C. § 2601. Our earlier decision in *Headwaters, Inc. v. BLM, Medford District*, 914 F.2d 1174 (9th Cir. 1990), which dealt specifically with the O&C Act, does not counsel a different conclusion. To be sure, *Headwaters* held that "the O & C Act envisions timber production as a dominant use," and rejected an environmental group's proposal to exempt "certain timber resources from harvesting to serve as wildlife habitat" because it was "inconsistent with the principle of sustained yield." *Id.* at 1183–84. But in *Headwaters* we never held that the O&C Act required timber production to be the *exclusive* use of O&C Land. Although saving the spotted owl might have been beyond Congress's vision of "forest production," *id.* at 1183, the statute's specific reference to "watersheds" and "recreational facil[i]ties" underscores that Congress contemplated alternative, secondary uses for the lands. Of note, *Headwaters* did not evaluate the O&C Act in the context, at issue here, of reconciling its statutory demands with the Antiquities Act. Ultimately, we affirmed BLM's exercise of discretion to manage the tract of O&C Land at issue as it saw fit—in that case, for logging. *Id.* at 1183–84.

Our reading of the O&C Act does not diverge from *Headwaters*'s recognition of the discretion vested in the

Department and BLM, a principle we apply here. We have repeatedly reinforced that the O&C Act grants the Department broad discretion to manage the lands in a flexible manner. For instance, in *Portland Audubon Society v. Babbitt*, we considered an analogous clash between the O&C Act and the National Environmental Policy Act ("NEPA"). 998 F.2d 705 (9th Cir. 1993). Environmental groups sued BLM for failing to prepare a Supplemental Environmental Impact Statement under NEPA in light of the presence of northern spotted owls on O&C Land used for logging. *Id.* at 707. Affirming the district court, we underscored BLM's discretion to manage O&C Land for multiple purposes, holding that "the plain language of the [O&C] Act supports the . . . conclusion that the Act has not deprived the BLM of all discretion with regard to either the [timber] volume requirements of the Act or the management of the lands entrusted to its care." *Id.* at 709. In the absence of a "clear and unavoidable conflict" between the two statutes, BLM could not use "an excessively narrow construction of its existing statutory authorizations" under the O&C Act to avoid compliance with NEPA. *Id.* (citation omitted). *Portland Audubon Society* thus reinforces the notion that BLM has latitude to reserve O&C Act land from logging in light of competing directives.

Just a few years later, in *Seattle Audubon Society v. Moseley*, we considered a logging-industry challenge to BLM's designation of certain O&C Lands as a spotted-owl habitat. 80 F.3d 1401 (9th Cir. 1996) (per curiam). The district court concluded that BLM's "management decision made here in regard to the [O&C] lands was a lawful exercise of the Secretary's discretion." *Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1314 (W.D. Wash. 1994). We affirmed. *Moseley*, 80 F.3d at 1406.

Together, these decisions reinforce our conclusion that the O&C Act's plain text envisions economic, recreational, and environmental uses for the O&C Lands beyond logging and grants the Department significant discretion in how to achieve statutory compliance.

### b.  History and Purpose

The O&C Act's legislative history confirms our reading of the statute's plain language.  Congress drafted the O&C Act to address "two basic criticisms" of its 1916 and 1926 statutory predecessors: "they required the timber to be sold as rapidly as possible and the cut-over lands disposed of," and they created a financial deficit due from the federal Treasury to Oregon counties.  *Clackamas*, 219 F.2d at 487. Accordingly, "[t]he purposes of the [1937] O & C act were twofold": provide a "stream of revenue" to the affected counties and "halt [the] previous practices of clear-cutting without reforestation."  *Headwaters*, 914 F.2d at 1183. Although in *Headwaters* we rather cursorily addressed the possibility of conservationist intent behind Congress's rejection of clear-cutting, *id.* at 1184, the historical record contains ample evidence of the government's growing environmental concern.  Without doubt, Congress intended to bestow significant discretion to the Department to manage the lands for posterity.

The O&C Act Committee Reports from the House and the Senate convey a concern for conservation and an intent to vest discretionary authority in the Department.  H.R. Rep. 75-1119 (1937); S. Rep. No. 75-1231 (1937) (adopting the House Report in full).  The Reports frame the Act as a course correction for the economic and environmental damage wrought by the 1916 and 1926 Acts.  These earlier statutes "called for outright liquidation" of timber without making

any provision "for the administration of the land on a conservation basis looking toward the orderly use and preservation of its natural resources." H.R. Rep. 75-1119 at 2. By 1937, times had changed: such a policy of deforestation was "now believed to be wasteful and destructive of the best social interests of the State and Nation." *Id.* at 2. Thus, Congress intended to set a *maximum*, not a minimum, quota for timber production, so that the O&C Lands' natural assets could be "conserved and perpetuated." *Id.* at 2, 4. Such forward thinking drove the statute's innovative adoption of "sustained yield" forestry, *see id.*, and deference to the Department's implementation of that strategy. Heeding the concerns of the Department's Acting Secretary, Congress sought to "provide conservation and scientific management for this vast Federal property which now receives no planned management." *Id.* at 2; *see also id.* at 4–6 (reprinting in full a letter from the Acting Secretary of the Interior).

Placing the Committee Reports in their historical context makes Congress's intent even clearer. The New Deal was an era of agency expansion and pragmatic conservationism. At the turn of the twentieth century, "[q]uick exploitation of the natural resources" was the dominant ideology in the West, and the federal government struggled to intervene. Roy E. Appleman, *Timber Empire from the Public Domain*, 26 Miss. Valley Hist. Rev. 193, 196 (1939). By the 1930s, however, Americans had developed an "increasing concern for the conservation of the nation's natural resources." Paul G. Dodds, *The Oregon and California Lands: A Peculiar History Produces Environmental Problems*, 17 Env't L. 739, 754 (1987).

In an era of scarcity like the Great Depression, economic and environmental preservation took on new urgency.

President Roosevelt preached a "gospel of conservation," Remarks at the Celebration of the Fiftieth Anniversary of State Conservation at Lake Placid (Sept. 14, 1935), which pressed the need to "to conserve soil, conserve water and conserve life," Fireside Chat (Sept. 6, 1936). Meanwhile, Secretary of the Interior Harold Ickes sought to rename his agency as the "Department of Conservation" and double its efforts to preserve natural resources and expand national parks. *Ickes Pushes New Department Unifying Federal Conservation*, N.Y. Times, Nov. 22, 1937, at 1, 7. Such a shift in thinking resonated at the local level as well: the northwest regional head of the U.S. Forest Service warned in 1934 that Oregon and Washington were facing a "day of social and economic reckoning" if they did not change their timber practices. William G. Robbins, *Timber Town: Market Economics in Coos Bay, Oregon, 1850 to the Present*, 75 Pac. N.W. Q. 146, 152–53 (1984). The O&C Act was designed to confront these contemporary challenges and empower the Department to create a roadmap for the future.

Accordingly, in the decades to follow, the Department implemented an ever-evolving multiple use strategy for the O&C Lands. Especially since the expansion of environmental legislation in the 1970s, the Department has increased protections for the Lands' flora and fauna while continuing to give credence to local communities' reliance on timber production. *See, e.g.*, *Lyons*, 871 F. Supp. at 1301–06, 1313–15 (summarizing the development and legislative backdrop of BLM resource management plans affecting O&C Lands in the 1980s and 1990s).

### 3. The Dissent Sidesteps the Fundamental Questions of Repeal and Inconsistency.

The dissent's concerns that Proclamation 9564 and the O&C Act are in conflict are unsubstantiated. To begin, the dissent misunderstands the powers granted to the President when issuing proclamations pursuant to the Antiquities Act. As the Supreme Court has noted, "[t]he Antiquities Act of 1906 permits the President . . . to create a national monument and reserve for its use simply by issuing a proclamation with respect to land *owned or controlled* by the Government of the United States." *United States v. California*, 436 U.S. 32, 40 (1978) (emphasis added and internal citation omitted). This authority includes the power to shift federal land from one federal use to another, *id.*, with a concurrent shift in the laws and regulations governing its use. "Without such reservation, the federal lands would remain subject to . . . continued federal management for [the previously] designated purposes." *Id.* Put another way, context is everything, and laws passed by Congress as to how federal lands should be treated in one context may not fairly apply when the land is shifted to a different use having its own set of rules.

Applied here, this means that President Obama, through his expansion of the Cascade-Siskiyou National Monument, did no more and no less than take a small portion of the O&C Lands and direct the Secretary to manage the area for a new use. This would hardly be the first time a President has used Antiquities Act authority to dedicate federal land for one use that Congress had previously appropriated for a different use. To take a recent example, President Obama in 2011 established the Fort Monroe National Monument, Proclamation 8750, 76 Fed. Reg. 68625 (Nov. 1, 2011), notwithstanding Congress's delegation to the Secretary of

Defense of the exclusive authority to "utilize [and dispose of] excess property . . . located" at the base after it was decommissioned as a military installation that same year, *see* 10 U.S.C. § 2687 note § 2905(b) (Defense Base Closure and Realignment Act of 1990). Though it is plain that the President's designation made it impossible for the Secretary of Defense to exercise this delegated authority, no one viewed the President's proclamation as somehow violative of Congress's previous authorization to the Secretary.

Second, in the dissent's view, such a reading of the Antiquities Act would effectively allow the President to repeal any disagreeable statute. This, however, reduces Congress to a bit player in federal land-management policy, erasing the long history of vigorous action it has taken in response to what it perceived to be presidential overreach. When Congress has disagreed with a President's decision to expand a monument or wanted to prevent the President from exercising Antiquities Act powers in the first instance, it has not hesitated to make its disagreement known through legislative action. The earlier-discussed examples from Wyoming and Alaska affirmatively demonstrate congressional interplay with presidential authority under the Antiquities Act. *See* Act of Sept. 14, 1950, Pub. L. No. 787, § 1, 64 Stat. 849, 849 (amending the Antiquities Act to prohibit "further extension or establishment of national parks or monuments in Wyoming" without congressional authorization following a dispute over the Jackson Hole National Monument); Act of Dec. 2, 1980, Pub. L. No. 96-487, § 1326(a), 94 Stat. 2371, 2488 (prohibiting future Executive Branch withdrawals of more than 5,000 acres of public lands within Alaska).

We do not suggest that congressional silence is the bellwether for interpretation. The important point is that the

designation here is not contrary to the text of the O&C Act, nor does it represent any effort to modify or nullify the Act.

Finally, the dissent's claim of executive nullification is hyperbole.  This is not a case where the executive's action eviscerates Congress's land-management scheme, nor is it a case that concerns "vast and amorphous expanses of terrain." *Mass. Lobstermen's Ass'n*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting the denial of certiorari).  Of the more than two million acres of O&C Lands, only some 40,000 acres—less than two percent—fall within the expanded Monument's territory, and the Secretary retains broad discretion over the millions of acres remaining.   The Proclamation does not usurp congressional intent or the Secretary's broad authority to regulate the O&C Lands as a whole.  If the dissent had its way, a President's Antiquities Act proclamation would be *ultra vires* whenever it arguably implicates some provision of a statute, no matter how minor the provision or how minimal the monument.  Not only would such a rule be without precedent, but it could potentially implicate many of the detailed land-management statutes throughout the United States Code.  *See, e.g.*, 43 U.S.C. §§ 1711–23, 1751–52, 1761–87 (sections featuring specific regulations on federal land).  Most importantly, the dissent's theory sidesteps the foundational question of whether the O&C Act repealed the Antiquities Act in the first place—it did not.  Whatever the dissent's concerns with the Antiquities Act writ large, this is not a case that tests the bounds of the Act.

## III. CONCLUSION

In short, the Proclamation is fully consistent with the O&C Act, which governs a much larger swath of timberlands in Oregon and gives the Secretary discretion in

administering those lands within the Act's directives.  We affirm the district court's grant of summary judgment in favor of the United States and Soda Mountain.

**AFFIRMED.**

---

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

## I

I agree that we may review claims that the President's execution of one statute obstructs the operation of another. However, I must respectfully dissent from the majority's conclusion that Proclamation 9564 does not conflict with the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act (O&C Act).

## II

This case arises from the protracted history of controversial land use decisions that have decimated Pacific Northwest timber communities long dependent on logging and wood product sales to sustain them.  The management of these vast swaths of federal land, removed from state and local tax rolls, has had a checkered history to say the least, but also a devastating economic impact on these towns.  The President's unilateral action here favoring environmental conservation interests is the latest skirmish.

Two small Oregon timber companies, Murphy Timber Company and Murphy Timber Investments, LLC (collectively Murphy Co.) own land that is impacted by adjacent federal timberland.  In 1937 Congress enacted the O&C Act and directed the Secretary of the Interior

(Secretary) to manage those federal timberlands primarily for "permanent forest production . . . in conformity with the principal [sic] of sustained yield." 43 U.S.C. § 2601. In 2017 President Obama issued a proclamation pursuant to the Antiquities Act which doubled the size of a preexisting national monument, created by President Clinton, to cover O&C timberlands. Proclamation 9564, 82 Fed. Reg. 6145 (Jan. 12, 2017). The Proclamation directs the Secretary to manage lands "under the same laws and regulations that apply to the rest of the monument," 82 Fed. Reg. at 6149, which absolutely prohibit sustained yield calculation and "[t]he commercial harvest of timber" within the monument. Proclamation 7318, 65 Fed. Reg. 37249, 37250 (June 9, 2000).

The question we face is whether the President, through an Antiquities Act proclamation, may direct a subordinate to disregard duties prescribed by another act of Congress. We should hold that "[t]he President cannot authorize a secretary . . . to omit the performance of those duties which are enjoined by law." *Marbury v. Madison*, 5 U.S. 137, 138-39, 154, 158 (1803) (summarizing and endorsing arguments of counsel).

## III

The majority opens with a sterile analysis of whether the O&C Act repealed the Antiquities Act. But whether the Antiquities Act and the O&C Act can coexist in the abstract is quite beside the point. Rather, we must decide whether Proclamation 9564—issued pursuant to the Antiquities Act—conflicts with the O&C Act. Even a perfunctory review of the plain text of the Proclamation and the O&C Act reveals an obvious conflict.

The Antiquities Act permits the President, in his "discretion, [to] declare by public proclamation historic landmarks . . . situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301. The parcels of the monument that the President may reserve must "be confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.*

Enacted three decades after the Antiquities Act, the O&C Act mandates that O&C timberlands "*shall* be managed" by the Secretary "for permanent forest production, and the timber thereon *shall* be sold, cut, and removed in conformity with the principal [sic] of sustained yield." 43 U.S.C. § 2601 (emphasis added). In calculating sustained yield, the Secretary must consider the following statutory goals: "providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties [sic]." *Id.* The O&C Act's *non-obstante* clause, which the majority dismisses as too vague to mean anything here, expressly provides: "All Acts or parts of Acts in conflict with this Act are hereby repealed to the extent necessary to give full force and effect to this Act." O&C Act, Pub. L. No. 75-405, § 5, 50 Stat. 874, 875 (1937).

Proclamation 9564 doubles the existing Cascade-Siskiyou National Monument to cover O&C timberlands, and it directs the Secretary to manage those lands under "laws and regulations," 82 Fed. Reg. at 6149, that outright prohibit "the commercial harvest of timber" and the "calculation or provision of a sustained yield of timber" on all lands falling within the monument. 65 Fed. Reg. at

37250.  This removes the land entirely from inclusion as available timberlands to meet statutory commands.

The conflict between the O&C Act and Proclamation 9564 could not be more self-evident.  The O&C Act requires sustained yield calculation for all O&C timberlands. Proclamation 9564 removes O&C timberlands from the sustained yield calculation if they fall within the monument. Although the Antiquities Act does grant the President broad authority to establish national monuments, nowhere does it remotely purport to grant him authority to suspend the operation of another act of Congress.  By expressly singling out sustained yield calculation for prohibition, the President's proclamation intentionally directs the Secretary to disregard her statutory duties under the O&C Act to make sure that timber is available for harvest to meet the economic needs of timber-dependent communities.

The Secretary's duty to conduct a sustained yield analysis for all O&C timberland "is not a proceeding which may be varied, if the judgment of the executive shall suggest one more eligible; but is a precise course accurately marked out by law, and is to be strictly pursued." *Marbury*, 5 U.S. at 158.  The Secretary must "conform to the law, and in this [s]he is an officer of the United States, bound to obey the laws." *Id.*  She acts "under the authority of law, and not by the instructions of the President.  It is a ministerial act which the law enjoins on a particular officer for a particular purpose." *Id.*  And the President must "take Care that the Laws be *faithfully* executed."  U.S. CONST. art II, § 3 (emphasis added).

Accordingly, the "judicial inquiry is complete" and "our job is at an end." *Connecticut Nat.'l Bank v. Germain*, 503 U.S. 249, 254 (1992) (quoting *Rubin v. United States*, 449

U.S. 424, 430 (1981)); *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020). We may not rewrite statutes or executive orders to avoid clear conflict, and the only task that remains is to give effect to the plain meaning of the O&C Act and declare the Proclamation void as to O&C timberland.

Other principles of construction require us to give effect to the O&C Act over Proclamation 9564. Under the canon of *generalia specialibus non derogant*, "a 'narrow, precise, and specific' statutory provision is not overridden by another provision 'covering a more generalized spectrum' of issues." *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 (9th Cir. 2016) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153-54 (1976)). We "assume Congress intended specific provisions to prevail over more general ones." *Id.* As Judge Richard Leon correctly observed in *American Forest Resource Council v. Hammond*, "[t]he Antiquities Act says nothing specific about managing O&C timberland. As such, it cannot be understood to nullify the timber harvest mandates imposed by Congress in the O&C Act." 422 F. Supp. 3d 184, 193 (D.D.C. 2019) (citations omitted). An executive proclamation issued pursuant to a general grant of authority cannot supersede a specific act of Congress.

Furthermore, later-in-time statutes generally take priority over earlier-enacted laws. *See Bell v. United States*, 366 U.S. 393, 407-08 (1961). The Antiquities Act, and any execution of it, must yield to the O&C Act because Congress enacted the O&C Act intending that it have "full force and effect" notwithstanding the existence of the Antiquities Act. O&C Act, § 5, 50 Stat. 875. But where an act is *both* later in time *and* more specific, the "specific policy embodied in a later federal statute should control our construction of the [earlier] statute." *Food & Drug Admin. v. Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530 (1998)).[1]   As the later-in-time statute specifically addressing the management of O&C lands to provide sustainable timber, the O&C Act supersedes the Antiquities Act and any ensuing proclamation.

The majority appears to have fashioned its own rule that where Congress wishes to restrict the President's Antiquities Act authority, it must do so expressly.  The majority cites instances where Congress has enacted legislation rebuking exercises of the Antiquities Act in Wyoming and Alaska, concluding that "Congress would speak as clearly and promptly here" if it felt the President had overstepped his authority.  This argument belies foundational principles of constitutional law and misconstrues the role of courts in our tripartite system of government.

The Judiciary may not abdicate its duty to curtail unlawful executive action merely because Congress may also act to restrain the President, THE FEDERALIST NO. 78 (Alexander Hamilton) (explaining constitutional limits "can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void"), and citizens need not await congressional action before seeking relief from unlawful executive action in the courts.  *Id.* ("There is no position which depends on clearer

---

[1] For similar reasons, the majority's reference to Congress's vague delegation of authority to the Secretary of Defense to "utilize excess property" at closed military bases is inapposite.  10 U.S.C. § 2687 note § 2905(b)(1)(A) (Defense Base Closure and Realignment Act of 1990). *See also id.* at § 2905(b)(1)(D) (also delegating authority to the Secretary of Defense to "determine the availability of excess or surplus real property for wildlife conservation purposes").

principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. . . . To deny this, would be to affirm . . . that the representatives of the people are superior to the people themselves . . . .").

"The danger of imputing to Congress, as a result of its failure to take positive or affirmative action through normal legislative processes, ideas entertained by the [majority] concerning Congress' will" is well known to courts. *Cleveland v. United States*, 329 U.S. 14, 23 (1946) (Rutledge, J., concurring). "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act." *Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981). For those reasons, "[o]rdinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation." *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983). And "[u]nder the *Youngstown* tripartite framework, congressional acquiescence is pertinent when the President's action falls within the second category—that is, when he 'acts in absence of either a congressional grant or denial of authority.'" *Medellin v. Texas*, 552 U.S. 491, 528 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). In other words, "[a]n inference drawn from congressional silence certainly cannot be credited when it is contrary to" the text of the O&C Act. *Burns v. United States*, 501 U.S. 129, 136 (1991). Moreover, even an affirmative act of Congress cannot grant the President the power to indefinitely modify or nullify duly enacted law. *See Clinton v. City of New York*, 524 U.S. 417, 436-47 (1998). The majority's deference to the political

branches of government in this case is contrary to our commitment to the rule of law.

Indeed, the far-reaching implications of the majority's interpretive rule are sobering: every federal land management law that does not expressly shield itself from the Antiquities Act is now subject to executive nullification by proclamation. I can find no limiting principle within the majority opinion that counsels otherwise. I think it manifestly more sensible to apply a different presumption: I would not construe a statute to grant the President unfettered authority to indefinitely suspend or cancel the operation of federal law, *see id.* at 443-44 (distinguishing between constitutional delegations of authority to suspend statutes and unconstitutional delegations of authority to cancel statutes), particularly where Congress has not expressly done so nor conditioned the suspension authority upon some intelligible changed circumstance. *See, e.g.*, 46 U.S.C. § 3101 ("When the President decides that the needs of foreign commerce require, *the President may suspend* a provision of this part . . . ." (emphasis added)); 46 U.S.C. § 60304 ("If the President is satisfied that the government of a foreign country does not impose discriminating or countervailing duties to the disadvantage of the United States, *the President shall suspend* the imposition of special tonnage taxes and light money . . . ." (emphasis added)); 22 U.S.C. § 4103 ("The President *may by Executive order suspend* any provision of this subchapter . . . if the President determines in writing that the suspension is necessary in the interest of national security because of an emergency." (emphasis added)).

A few simple counterfactuals illustrate the infirmity of the majority's position. As the majority notes, the year the O&C Act was enacted, President Franklin Delano Roosevelt

exercised his Antiquities Act authority several times. Suppose, for the sake of argument, President Roosevelt had been opposed to logging and the O&C Act had been adopted over his veto. According to the majority, President Roosevelt could have lawfully obstructed the clear will of Congress by issuing an Antiquities Act proclamation prohibiting sustained yield logging on some or all of the timberland the very next day.

Suppose a President wishes to protect Crater Lake National Park from the harmful effects of park visitors. Under federal law, the "National Park shall be open, under such regulations as the Secretary of the Interior may prescribe, to all scientists, excursionists, and pleasure seekers." 16 U.S.C. § 123. According to the majority, however, the President can prohibit visitors by issuing an Antiquities Act proclamation reclassifying the park as a national monument. I cannot agree that Congress intended to cede this unbridled power to the President when it enacted the Antiquities Act.

By permitting Proclamation 9564 to supplant the O&C Act, the majority has transmuted the Antiquities Act into a coiled timber rattler poised to strike at any land management law that the President dislikes.

IV

Notwithstanding the undeniable conflict between Proclamation 9564 and the O&C Act, the majority concludes they can be reconciled because the O&C Act "delegated ample discretion to the Department of the Interior to manage the lands in a flexible manner." But it is unclear how the mere grant of discretion as to how a sustained yield analysis should be conducted can justify the President's total prohibition on even engaging in a sustained yield analysis in

the first place by removing O&C timberlands from the calculation.

The majority first argues that the O&C Act and the Proclamation are reconcilable because the Secretary has unfettered discretion to classify or declassify O&C land as timberland. This proposition is dubious at best. First, interpreting the O&C Act to vest the Secretary with unfettered discretion to declassify O&C timberland runs afoul of the Constitution's requirement that "an 'intelligible principle' [must] guide the delegee's exercise of authority." *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019). Given the O&C Act incorporated O&C lands "heretofore" and "hereafter" classified as timberlands, rather than grant the Secretary unbounded discretion, it seems more likely that Congress intended for the Secretary to classify O&C land consistent with past practice, meaning "lands bearing a growth of timber not less than three hundred thousand" board feet per 40 acres. Chamberlain-Ferris Act, Pub. L. No. 86, ch. 137, § 2, 39 Stat. 218, 219 (1916); *see also Bilski v. Kappos*, 561 U.S. 593, 647 (2010) (explaining "an ambiguity in a later-in-time statute must be understood in light of the earlier-in-time framework against which the ambiguous statute was passed").

Second, even assuming the Secretary possesses fiat authority to declassify the O&C timberlands at issue, the government has not directed us to a rulemaking by the Secretary actually doing so. Since Murphy Co. has made clear that its suit pertains only to O&C lands that the Secretary has heretofore classified as timberlands, the Secretary's supposed authority remains unexercised and is therefore irrelevant to this appeal.

Although conceding that the dominant use for O&C timberlands is timber production to sustain struggling timber communities, the majority next argues that the Proclamation is justified because the Secretary has discretion to consider the additional goals of "protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties" when conducting a sustained yield analysis. 43 U.S.C. § 2601. But Proclamation 9564 is not an exercise of the Secretary's discretion; it is a presidential command. The command does not itself direct the Secretary to exercise her discretion in a certain manner, but rather it restricts her from exercising any discretion at all by prohibiting sustained yield analysis within the monument. It preordains a result and directs the Secretary, for all time, to prohibit commercial logging on the relevant O&C timberlands regardless of changing conditions on the ground. The mere fact that the Secretary could effectuate a similar outcome if given the freedom to exercise her statutorily mandated O&C Act discretion is insufficient to rescue the President's unlawful command.

V

Conservation is a noble goal, and national monuments have undoubtedly preserved and proliferated the richness of the American landscape. But the unfortunate back-end cost of conservation is that small, local communities reliant on the cultivation of natural resources to generate revenue to sustain them are often left behind. Congress sought to strike a balance with the O&C Act by granting the Secretary the

authority and ability to consider both the interests of conservation and the interests of local communities.[2]

I am troubled by the President's overt attempt to circumvent the balance struck by Congress and the majority's haste in labeling that attempt with the imprimatur of law. The decision today continues a troubling trend of increased judicial deference to Presidential uses of the Antiquities Act. As the Chief Justice has observed, this trend cannot continue indefinitely:

> Somewhere along the line, [the Antiquities Act's textual limits have] ceased to pose any meaningful restraint. A statute permitting the President in his sole discretion to designate as monuments "landmarks," "structures," and "objects"—along with the smallest area of land compatible with their management—has been transformed into a power without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea.

*Massachusetts Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 981 (2021) (Roberts, C.J., statement respecting the denial of certiorari). These issues are not going away. Just recently, President Biden designated two new national monuments spanning over half a million acres. *See FACT*

---

[2] Indeed, the Clinton Administration, which first established the Cascade-Siskiyou National Monument, once boasted that the administration had "stepped up to the challenge to get a sustainable timber supply pipeline flowing again." The Clinton White House, *The President's Forest Plan*, National Archives, https://clintonwhitehouse4.archives.gov/WH/EOP/OP/html/forest.html (last visited Apr. 7, 2023).

*SHEET: President Biden Designates Castner Range National Monument*, The White House (Mar. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-rele ases/2023/03/21/fact-sheet-president-biden-designates-cast ner-range-national-monument/; *FACT SHEET: President Biden Designates Avi Kwa Ame National Monument*, The White House (Mar. 21, 2023), https://www.whitehouse.gov/ briefing-room/statements-releases/2023/03/21/fact-sheet-pr esident-biden-designates-avi-kwa-ame-national-monument/. I agree with the Chief Justice that this trend is unsustainable and likewise urge a return to the textual strictures of the Antiquities Act.

At oral argument, the government conceded that if Proclamation 9564 had expanded the monument to cover all 2.4 million acres of O&C land, it would have violated the O&C Act. But the government insisted that the Proclamation was lawful because the adverse effect on the O&C Act was minimal. By accepting that argument, the majority engages in a brand of incrementalism perilous to constitutional principles that are absolute.

It may be expedient to delegate unfettered control over the destiny of public lands to the President. But the Constitution enshrines our fundamental understanding that the separation of powers is an "essential precaution in favor of liberty." THE FEDERALIST NO. 47 (James Madison). Each branch of government has an obligation to police the boundaries of power and guard against delegations of, and encroachments on, their constitutionally vested power. THE FEDERALIST NO. 51. When called upon to adjudicate a case or controversy, the Judiciary, as the apolitical expositor of the Constitution, must decline to acquiesce in undertakings by the political branches that would sacrifice constitutional

safeguards on the altar of political expediency. *See United States v. Nixon*, 418 U.S. 683, 703 (1974).

Although the Constitution does not "absolutely separate" the three forms of governmental power, it absolutely prohibits the President from making law, even concerning the most inconsequential of matters. THE FEDERALIST NO. 47. Proclamation 9564 violates this prohibition because it directs the Secretary of the Interior to disregard her obligations under the O&C Act. Only Congress may do this.

Proclamations and executive orders of this reach are often responsive to criticisms by advocates that Congress is too formalistic and inflexible in performing its legislative function as originally envisioned by the Framers in today's dynamic world. The legislative process can sometimes be slow and frustrating, but the procedural strictures enshrined in our Constitution are unyielding because they exist to maintain our Republic's status as a government of laws and not of men. *See Bond v. United States*, 564 U.S. 211, 222-23 (2011); *Horne v. Dep't of Agric.*, 576 U.S. 350, 362 (2015) ("The Constitution . . . is concerned with means as well as ends."). As Justice Holmes once noted, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922). The majority seems unbothered by today's erosion of our constitutional principles. I am not so sanguine and must respectfully dissent.